Sam E. McDOWELL, Dale E. Bondurant, Ronald Mahle and Harold Eastwood, Appellants,

v.

STATE of Alaska, Alaska Department of Fish and Game, Alaska Board of Fisheries, Alaska Board of Game and Don W. Collinsworth, Commissioner of Fish and Game, Appellees,

The Alaska Federation of Natives, Protectors of the Land d/b/a Numan Kitlutsisti, Tony Vaska and Walter Charley, on behalf of himself and all other persons similarly situated, Intervenors/Appellees.

No. S–2732.

Supreme Court of Alaska.

Dec. 22, 1989.

Rehearing Denied March 2, 1990.

Cheri C. Jacobus, Ross, Gingras, Bailey & Miner, P.C., Anchorage, for appellants.

Larri Irene Spengler, Asst. Atty. Gen., Grace Berg Schaible, Atty. Gen., Juneau, for appellees.

Donald Craig Mitchell, Anchorage, for intervenors/appellees.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Chief Justice.

### INTRODUCTION

This case challenges chapter 52 SLA 1986 which grants a preference to rural residents to take fish and game for subsistence purposes. The only requirement to be met by a subsistence fisherman or hunter is residency in a rural area of the state.

The rural preference is challenged under several provisions of the Alaska Constitution: the common use clause, article VIII, section 3; the no exclusive right of fishery clause, article VIII, section 15; the uniform application clause, article VIII, section 17; the equal rights clause, article I, section 1; and the due process clause, article I, section 7. In addition, violation of the equal protection and due process clauses of the United States Constitution is claimed. For the reasons that follow, we hold that the rural preference violates article VIII, sections 3, 15 and 17 of the Alaska Constitution.

### FACTUAL AND PROCEDURAL SETTING

The 1986 act[1] defines subsistence fishing and hunting as activities which can be undertaken only "by a resident domiciled in a rural area of the state...." Subsistence

---

1. For ease of reference, citations to chapter 52 SLA 1986 in this opinion will be to the appropriate section of the Alaska Statutes where that act is codified.

uses are also defined in terms of residency in rural areas:

"Subsistence uses" means the noncommercial, customary and traditional uses of wild, renewable resources by a resident domiciled in a rural area of the state for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation, for the making and selling of handicraft articles out of non-edible by-products of fish and wildlife resources taken for personal or family consumption, and for the customary trade, barter, or sharing for personal or family consumption.

AS 16.05.940(30). A "rural area" is defined as "a community or area of the state in which the noncommercial, customary, and traditional use of fish or game for personal or family consumption is a principal characteristic of the economy of the community or area." AS 16.05.940(25).

Appellants are Alaska residents who have engaged in subsistence hunting and fishing in the past and wish to continue to do so. Under the 1986 act, they are disqualified as subsistence users because they reside in areas classified as non-rural by the joint Boards of Fisheries and Game. Appellants McDowell and Mahle reside in Anchorage, Bondurant resides in Cooper Landing, and Eastwood resides in the community of McKinley Park.

The 1986 act requires the Board of Fisheries and the Board of Game to decide what portion of each fish stock and game population can be harvested consistent with the principle of sustained yield. Next the Boards must determine how much of the harvestable portion is needed to satisfy subsistence needs. If the harvestable portion of any stock or population is not sufficient to accommodate all consumptive uses —sport, personal use, and commercial— then subsistence uses

shall be accorded a preference over other consumptive uses, and the regulations shall provide a reasonable opportunity to satisfy the subsistence uses. If the harvestable portion is sufficient to accommodate the subsistence uses of the stock or population, then the Boards may provide

for other consumptive uses of the remainder of the harvestable portion.

AS 16.05.258(c). If the harvestable portion of a stock or population is insufficient to satisfy all subsistence needs, all non-subsistence uses are barred, and the Boards are required to distinguish among subsistence users by applying three criteria: "(1) customary and direct dependence on the fish stock or game population as the mainstay of livelihood; (2) local residency; and (3) availability of alternative resources." *Id.*

This case was brought in 1983 as a challenge to the 1978 subsistence statute, chapter 151, section 4 SLA 1978. The 1978 statute established that subsistence hunting and fishing had priority over other uses of fish and game stocks. Like the 1986 statute, it provided for two tiers of subsistence users. In the first tier were those who could take fish or game for subsistence purposes when populations were adequate to satisfy all subsistence needs. The second tier was limited to those who could take fish and game for subsistence purposes when populations were inadequate to supply all subsistence needs. The 1978 statute distinguished the second tier of subsistence users from the first tier on the basis of the same three factors utilized in the 1986 statute, namely, customary and direct dependence, local residency, and availability of alternative resources. *Id.* However, unlike the 1986 statute, the 1978 statute did not impose a rural residency requirement as a condition to becoming a first-tier subsistence user.

The appellants' initial complaint challenged the second-tier subsistence priority of the 1978 statute. The complaint was amended several times to expand on the original theory and add challenges to various regulations. All parties submitted motions for summary judgment. The superior court granted some of these motions and deferred others on October 24, 1984. Before the deferred motions could be ruled on, this court decided *Madison v. Alaska Department of Fish and Game,* 696 P.2d 168 (Alaska 1985), which struck down, as inconsistent with the 1978 statute, subsist-

ence fishing regulations which imposed a rural residency requirement on first-tier subsistence users. *Id.* at 178.

The next event of significance was the passage in 1986 of chapter 52 SLA 1986, which, as noted, provides that only rural residents can be first- or second-tier subsistence users. Following passage of this act, the appellants again amended their complaint, challenging the rural preference on constitutional grounds. Both the appellants and the state moved for summary judgment. The superior court granted the motion of the state and denied the motion of the appellants. Judgment was entered on the basis of this ruling.

The setting of this case would not be complete without mention of the Alaska National Interest Lands Conservation Act (ANILCA), enacted by Congress in 1980.[2] Section 3114 of this act requires that on federal public lands in Alaska, subsistence uses are to be given priority over the taking of fish and wildlife for other purposes. Under ANILCA, only rural Alaska residents are entitled to a subsistence priority.[3] ANILCA requires federal management of public lands in Alaska in order to ensure the subsistence priority.[4] However, federal management may be supplanted by the state so long as the state enacts and implements subsistence laws "which are consistent with, and which provide for the definition, preference, and participation specified in" ANILCA.[5]

After this court's *Madison* decision, the Secretary of the Interior notified the state that state law was no longer consistent with ANILCA and that federal management would begin unless consistency was achieved by June 1, 1986. *Kenaitze Indian Tribe v. State of Alaska*, 860 F.2d 312, 314 (9th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3187, 105 L.Ed.2d 695 (1989). With the passage of the 1986 act, the Interior Department has stated that Alaska is once again in compliance with ANILCA. *Id.*

After final judgment was entered by the superior court, the 9th Circuit Court of Appeals ruled that the definition of "rural" in the 1986 act does not comply with § 3113 of ANILCA. *Id.* 860 F.2d at 318. "Rural," in ANILCA, according to the court, refers to "sparsely populated" areas; "rural is the antonym of urban and includes all areas in between cities and towns of a particular size." *Id.* at 316–17. The court referred to Census Bureau standards under which "the urban population consists of people living in communities of 2,500 or more, while the rural population comprises everyone else." *Id.* at 317. Thus, the 1986 act's subsistence-oriented definition was held inconsistent with ANILCA.

Bondurant and Eastwood both reside in rural areas as *Kenaitze* has interpreted ANILCA's use of that term. They are thus probably entitled to injunctive relief under ANILCA, 16 U.S.C.A. § 3117(a).[6]

---

**2.** 16 U.S.C.A. §§ 3101–3233 (West 1985).

**3.** ANILCA § 804, 16 U.S.C.A. § 3114, states:

Except as otherwise provided in this Act and other Federal laws, the taking on public lands of fish and wildlife for nonwasteful *subsistence uses* shall be accorded *priority* over the taking on such lands of fish and wildlife for other purposes. Whenever it is necessary to restrict the taking of populations of fish and wildlife on such lands for subsistence uses in order to protect the continued viability of such populations, or to continue such uses, such priority shall be implemented through appropriate limitations based on the application of the following criteria:
(1) customary and direct dependence upon the populations as the mainstay of livelihood;
(2) local residency; and
(3) the availability of alternative resources.
(Emphasis added).

ANILCA § 803, 16 U.S.C.A. § 3113, defines the term "subsistence uses" as used in ANILCA to mean
the customary and traditional uses *by rural Alaska residents* of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade.
(Emphasis added.)

**4.** 16 U.S.C.A. § 3115(c).

**5.** 16 U.S.C.A. § 3115(d).

**6.** Such relief has not been requested in this case, and the question whether the § 3117(a) remedy

However, the *Kenaitze* decision does not change the issues presented in this appeal because the 1986 statute remains fully applicable to all non-federal lands.

## Background and Purpose of the 1986 Statute

Prior to 1978, urban residents could engage in subsistence hunting and fishing. However, there was no statutory preference given to subsistence over sport or commercial fishing or sport hunting. With the enactment of chapter 151 SLA 1978, subsistence hunting and fishing was given such a priority. *Madison*, 696 P.2d at 174 n. 12. The 1978 statute did not bar urban residents from eligibility as first-tier subsistence users. *Madison*, 696 P.2d at 176. However, a regulation adopted by the Board of Fish and Game did exclude urban residents. 5 AAC 01.597. *Madison* held that this regulation violated the 1978 statute. *Id.*

In 1985 the Alaska House of Representatives adopted a letter of intent which accompanied the bill that became the 1986 subsistence act. 1985 House Journal 1246. The letter explained the rural preference of the 1986 act as follows: ·

> This limitation of the definition of "subsistence uses" recognizes that Alaska is unique, and unlike any of the other forty-nine states, the economy of many rural communities in rural areas in Alaska is significantly dependent upon participation by the residents of these communities in the taking of fish stocks and game populations for personal and family consumption. Further, the legislature finds that the general health and welfare of these citizens is significantly tied to their participation in these activities.

*Id.* at 1229–30. In making this determination, the legislature sounded a theme that was also expressed by Congress in enacting ANILCA. The House Committee on Interior and Insular Affairs determined that:

> After consideration of the testimony at the subcommittee's hearings and town meetings throughout Alaska and review of studies done by a variety of federal, state, academic, and other agencies and groups, the Committee has no doubt about the importance of subsistence uses to the rural people of Alaska. Reliable evidence was given to the Committee demonstrating that fifty percent of the food for three-quarters of the Native families in Alaska's small and medium villages is acquired through subsistence uses, and 40 percent of such families spend an average of 6 to 7 months of the year in subsistence activities....

H.R.Rep. No. 1045, 95th Cong., 2d Sess., at 181 (1978). The intervenors in this appeal similarly expressed the purpose of the rural preference as follows:

> If village access to fish and game is overwhelmed by competition from the tens of thousands of sportsmen who Alaska's fortuitous oil wealth has drawn to the urban centers, the effect on the rural village economy would be adverse, and the effect on the health and welfare of rural residents would be even more so.

An additional purpose of the 1986 subsistence law is to retain state management of fish and game on federal lands by meeting the requirements of ANILCA.[7]

## Urban–Rural Subsistence Patterns

Appellants' basic objection to the 1986 act is that by excluding from eligibility as subsistence users all urban dwellers and by including all rural dwellers, the act unfairly excludes some urban residents who have lived a subsistence lifestyle and desire to continue to do so, while needlessly including numerous rural residents who have not engaged in subsistence hunting and fishing. Appellants claim, in other words, that the urban/rural criterion is both unfairly

is available only in federal courts has not been briefed.

**7.** Senator Fisher, a member of the Senate Resource Committee, noted in the Senate floor debate: "[T]his legislation will provide the boards the tools to solve the problems in harvest disruption that followed *Madison,* and will assure the state will retain management of fish and game throughout Alaska by meeting the requirements of the federal subsistence law."

under-inclusive, because it excludes deserving urban residents, and over-inclusive, because it includes undeserving rural residents. Appellants instead suggest that the right to subsistence should depend upon individual needs and traditions, not on one's place of residence.

The record supports the appellants' claim that there are substantial numbers of urban subsistence users. A state study of subsistence use patterns [8] found that of some 255 holders of subsistence salmon permits for the 1980 Tanana River fishery, approximately 20% exhibited the attributes commonly associated with a traditional subsistence lifestyle, even though they all resided in the urban Fairbanks area. The report states:

> Despite their residence in or near populated areas of the Fairbanks North Star Borough, these households generally participated in the wage economy on a seasonal basis and had longer histories of participation in the fishery, lower cash incomes, and somewhat larger household sizes than the majority of users. Some of these households have longstanding cultural ties to the subsistence fishery. For these more intensive users, fishing in sub-district Y–6C was less a recreational outing than an integral component of their way of life in Interior Alaska. Their residence in an area which is currently defined by regulation as urban, coupled with escalating demands upon the resource base, however, raise questions about whether these more intensive uses can continue in the future.

Study at 12. Similarly, in the city of Homer, an urban area under the regulations,[9] the study reports that 38.2% of the city residents obtained at least one-half of their meat and fish supply from personal hunting and fishing activities. *Id.* at 162.

Likewise, the study documents the fact that numerous Alaskans who live in areas classified by the regulations as rural do not engage in subsistence activities. For example, in the City of Sitka, which is classified as rural, although it has a population of 7,803, some 26% of the households sampled did no hunting and 7% did no fishing. *Id.* at 235. Similarly, in the City of Nome, population 3,249, which is also rural under the regulations, *id.* at 93, some 5% of all households use no locally taken fish or game. *Id.* at 111.

The study also amply supports the critical importance of subsistence hunting and fishing to residents of the numerous small and remote villages of our state. For example, in the Wade Hampton census area of Western Alaska, the average annual per capita cash income was only $2,737 (1979),[10] *id.* at 30, and the average household harvested 4,597, dressed weight, pounds of fish and game each year. *Id.* at 42.

## The Article VIII Clauses—History and Analysis

### A.

Section 15 of article VIII of the Alaska Constitution provides:

> No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State. This section does not restrict the power of the State to limit entry into any fishery for the purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the State.

Section 3 of article VIII provides:

> Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.

Section 17 of article VIII provides:

> Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter

8. R.J. Wolfe and L.J. Ellanna *Resource Use and Socioeconomic Systems: Case Studies of Fishing and Hunting in Alaskan Communities,* Technical Paper Number 61, Alaska Department of Fish and Game, Division of Subsistence, Juneau, March, 1983 (hereinafter "Study").

9. 5 AAC 99.014.

10. The 1979 statewide average was $11,152. Study at 30.

and purpose to be served by the law or regulation.

Although the ramifications of these clauses are varied, they share at least one meaning: exclusive or special privileges to take fish and wildlife are prohibited. Section 15 states this explicitly with respect to fisheries. The proceedings of our Constitutional Convention show that the same meaning was intended with respect to sections 3 and 17.

A memorandum of the Constitutional Convention Committee on Resources expresses the view that the common use clause has as one of its purposes a prohibition on exclusive grants or special privileges. The memorandum states: "The expression 'for common use' implies that these resources are not to be subject to exclusive grants or special privileges as was so frequently the case in ancient royal tradition." Alaska Constitutional Convention Papers, Folder 210, Papers Drafted by Committee on Resources, entitled "Terms."

The Committee on Resources commentary with respect to the uniform application clause states:

> This section is intended to exclude any especially privileged status for any person in the use of natural resources subject to the disposition of the state.

6 Proceedings of the Alaska Constitutional Convention 84 (Dec. 16, 1955).

In *Owsichek v. State*, 763 P.2d 488 (Alaska 1988), we observed that the article VIII provisions were designed to ensure to the public the broadest possible access to wildlife. We noted that "the common use clause impose[s] upon the state a trust duty to manage the fish, wildlife and water resources of the state for the benefit of *all* the people." *Id.* at 495 (emphasis added). "[A] minimum requirement of this duty is a prohibition against any ... special privileges." *Id.* at 496. In *State v. Ostrosky*, 667 P.2d 1184, 1191 (Alaska 1983), we observed that the common use and no exclusive right of fishery clauses reflected "anti-exclusionist values."

Appellants contend that the rural residency requirement amounts to an exclusive or special privilege prohibited explicitly by section 15 and implicitly by sections 3 and 17. They focus on *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231 (1949), a case which interpreted section 1 of the White Act, former 48 U.S.C. §§ 220–224 (1941), under which Alaska fisheries were regulated before statehood. In *Hynes*, the Supreme Court held that the White Act prohibited granting a preferential right to fish to Native residents of the Karluk Reservation. *Id.* at 123, 69 S.Ct. at 989. This case is of precedential importance, they contend, because section 15 was based on section 1 of the White Act.

In response, the state agrees that the first sentence of section 15 is based on section 1 of the White Act. However, the state distinguishes *Hynes* on the grounds that the exclusive right to fish there was available to "a closed class." In contrast, it argues there is no closed class here because "people may become eligible to participate in subsistence uses by establishing their domicile in a rural area." Further, the state relies on *Kenai Peninsula Fishermen's Cooperative Association v. State*, 628 P.2d 897, 904 (Alaska 1981) which held that section 15 does not bar differential treatment between commercial, sport, and subsistence fishermen. The intervenors' argument in response relies exclusively on this case.

The parties correctly agree that the no exclusive right of fishery clause is based on section 1 of the White Act. The commentary concerning the exclusive right of fishery clause prepared by the Committee on Resources of the Constitutional Convention states:

> This section is intended to serve as a substitute for the provision prohibiting the several right of fisheries in the White Act. Instead of using the terminology of that Act the purposes sought by it are given expression in a prohibition of exclusive right or special privileges of any person to the fisheries of the state.

6 Proceedings of the Alaska Constitutional Convention Proceedings at 87 (Alaska Legislative Council).

The language of the White Act, for which the no exclusive right clause is meant to be a substitute, is as follows:

Provided, that every such regulation made by the Secretary of the Commerce shall be of general application within the particular area to which it applies, and that no exclusive or several right of fishery shall be granted therein, nor shall any citizen of the United States be denied the right to take, prepare, cure, or preserve fish or shellfish in any area of the waters of Alaska where fishing is permitted by the Secretary of the Commerce.

Act of June 6, 1924, ch. 272, § 1, 43 Stat. 464.

The appellants' reliance on *Hynes* as an explanation of the meaning of the bar on exclusive rights and special privileges is apt. At issue in *Hynes* was a regulation of the Secretary of the Interior [11] prohibiting commercial salmon fishing in all waters within 3,000 feet of the shores of the Karluk Reservation. 337 U.S. at 92, 69 S.Ct. at 973. The Secretarial Order made an exception which allowed Natives residing on the Reservation and their licensees to fish in these waters. *Id.* The Supreme Court held that this exception in favor of the Native residents and their licensees violated section 1 of the White Act. The court stated:

[W]e think it clear that its proviso, "that no exclusive or several right of fishery shall be granted therein," applies to commercial fishing by Natives equally with fishing companies, nonresidents of Alaska or other American citizens and so applies whether those Natives are or are not residents on a reservation. We find nothing in the White Act that authorizes

the Secretary of the Interior to grant reservation occupants the privilege of exclusive commercial fishing rights.... "Exclusive," as used in Section 1 of the White Act, forbids not only a grant to a single person or corporation but to any special group or number of people. The legislative history set out above shows this. The offending regulations which brought about the enactment of the proviso in § 1 of the White Act were administered so as to limit fishing to those who had been using the fisheries before the regulations.

337 U.S. at 122, 69 S.Ct. at 988.[12]

As noted above, the state seeks to distinguish *Hynes* on the ground that *Hynes* involved a closed class of recipients of a special privilege, whereas the 1986 subsistence law does not because anyone who wants to hunt and fish for subsistence purposes can move to a rural area. We find this argument unpersuasive. If it were valid, virtually any discrimination based on residence would be justified—the residents of the disfavored area could simply move. Such a rationale is inconsistent with the prevailing approach in territorial discrimination cases, which is to subject territorial classifications to scrutiny under the equal protection clause. *Gilman v. Martin,* 662 P.2d 120, 125 (Alaska 1983); Neuman, *Territorial Discrimination, Equal Protection, and Self-Determination,* 135 U.Pa. L.Rev. 261, 274–75 (1987).

The state's and the intervenors' reliance on *Kenai Peninsula* is also off the mark. That case merely affirmed what article VIII, section 4 [13] says explicitly—that preferences among beneficial uses of fish and

**11.** Regulatory jurisdiction over the administration of the White Act was transferred from the Department of Commerce to the Department of the Interior, effective July 1, 1939; *Hynes,* 337 U.S. at 92 n. 4, 69 S.Ct. at 973 n. 4.

**12.** We do not agree with Justice Rabinowitz's statement in dissent that the limitation struck down in *Hynes* was predicated solely on the fact that the users were Indians. *Infra* at 18. Both ethnic status and local residency were required as the regulation in question applied to "natives in possession of [the Karluk] reservation." 337

U.S. at 92, 69 S.Ct. at 973. In any case, the quote in the text makes it clear that if the exception had been based solely on residence, rather than on residence and race, it would also have been struck down.

**13.** Article VIII, section 4 of the Alaska Constitution provides:

Fish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses.

game may be legislatively or administratively established. We stated in *Kenai Peninsula:*

> While section 15 does prohibit granting monopoly fishing rights, that section was not meant to prohibit differential treatment of such diverse user groups as commercial, sport, and subsistence fishermen. To conclude that, because a certain species is made available for sport fishing in a given area, commercial fishing of the same species must also be allowed, would be to go far beyond the purpose of the section.

628 P.2d at 904 (footnote omitted). The state may, indeed must, make allocation decisions between sport, commercial, and subsistence users. That authority, however, does not imply a power to limit admission to a user group.[14]

Section 1 of the White Act guaranteed equal access to fisheries regardless of residence. The language of the Act and *Hynes* make this clear.[15] Alaska's constitutional

**14.** The foregoing also answers Justice Rabinowitz's contention that our interpretation of the equal access clauses of article VIII is in conflict with article VIII section 4. We have consistently taken the position that limits on admission to user groups are subject to scrutiny under the article VIII equal access clauses. *See State v. Ostrosky,* 667 P.2d 1184, 1189 (Alaska 1983); *Owsichek v. State,* 763 P.2d 488, 492 (Alaska 1988).

**15.** The legislative history of the White Act is in accord. Congressional debate at the time the White Act was proposed demonstrated concern that Alaska residents and non-residents alike were being excluded from Alaska fisheries. The debate also demonstrated Congress' desire that Alaska fisheries be equally accessible to everyone:

> Mr. Robinson. The Secretary of Commerce sought to give exclusive right to fish in certain Alaskan water, and out of this attempt to give exclusive rights to fish, thus depriving a large number of the people the right to pursue their usual vocation, great complaint arose. This bill, however, denies to the Secretary of Commerce any power to grant an exclusive right to fish and *requires him to give everyone equal rights within the areas where fishing is permitted.*
>
> . . . .
>
> Mr. Jones of Washington. The bill removes the principal cause of complaint with reference to the exercise of power by the Secretary of Commerce.... Within the two reservations [of restricted fishing areas] that were created by Executive Order a year or two ago the Secretary of Commerce has seen fit to make regulations under which outsiders might not go in order to fish. In other words, those who are already located there, if [the Secretary] thought they took all the fish that should be taken, were given the full rights, and nobody else could go in there and take fish.
>
> Mr. King: They were given exclusive rights.
>
> Mr. Jones of Washington. They may be called exclusive rights, but I want to say this in justice to the Secretary of Commerce:

> When I came back this fall, and came down here, and we were considering matters of this kind, the Delegate from Alaska and I talked over the matter with reference to those exclusive rights, and I saw the Secretary of Commerce, and the Secretary of Commerce himself said that he would be glad to have that discretion taken away, that certainly he was not in favor of that policy, but those who were on the ground and who had been dealing with the matter especially and who might be considered to be experts had recommended and urged that that policy be pursued. I will say, in justice to him, that he said frankly that he would prefer not to have that absolute power, so I can say for him that he is glad that this provision is put in the bill prohibiting him from granting exclusive rights within the fishing areas up there.
>
> . . . .
>
> Mr. Robinson. I have been unable to find any authority for [the Secretary] to grant exclusive rights of fishery. It was about that alleged abuse of authority that most of the complaints arose; namely, that the Secretary in some instances had created reservations, and in others had granted in certain waters the exclusive right to fish, usually to large corporations or packing concerns, which deprived the fishermen of the opportunity to pursue their occupations; and they desired very much *the provision* that is *in this bill,* which *secures to every citizen of the United States the right to fish in Alaskan waters upon equal terms and without discrimination.* The bill deprives the Secretary of any power ... to grant exclusive rights to fish in Alaskan waters.

65 Cong.Rec. 9520–21 (1924) (emphasis added). Based in part upon the Congressional debate identified above, *Hynes* concluded that

> [T]he legislative history of the White Act only emphasizes what the statute clearly says, that is, no special privileges in Alaskan fishing preserves.

*Hynes,* 337 U.S. at 120, 69 S.Ct. at 987 (footnote omitted).

framers were aware of *Hynes*.[16] As noted, section 15 of article VIII was meant to be a substitute for section 1 of the White Act and to further its purposes.[17] It follows that section 15 likewise was meant to ensure an equal right to participate in fisheries, regardless of where one resides.

Although section 15 pertains only to fisheries, the prevention of grants of exclusive or special privileges with respect to fish and game is also one purpose of the common use and the uniform application clauses.[18] It follows that the grant of special privileges with respect to game based on one's residence is also prohibited.

We therefore conclude that the requirement contained in the 1986 subsistence statute, that one must reside in a rural area in order to participate in subsistence hunting and fishing, violates sections 3, 15, and 17 of article VIII of the Alaska Constitution.[19]

### B.

The conclusion we have reached does not mean that everyone can engage in subsistence hunting or fishing. We do not imply that the constitution bars all methods of exclusion where exclusion is required for species protection reasons. We hold only that the residency criterion used in the 1986 act which conclusively excludes all urban residents from subsistence hunting and fishing regardless of their individual characteristics is unconstitutional.

We are not called upon in this case to rule on what selection criteria might be constitutional. It seems appropriate, however, to note that any system which closes participation to some, but not all, applicants will necessarily create a tension with article VIII. In such cases, assuming that the exclusionary criterion is not per se impermissible, our decisions suggest that demanding scrutiny is appropriate.

We alluded to this in *State v. Ostrosky*, 667 P.2d 1184 (Alaska 1983) in discussing the interplay between the constitutionally allowed limited entry system, which was permitted by amendment to article VIII, section 15, and the common use and no exclusive right of fisheries clauses. We stated:

[S]ince the common use clause of section 3 and the no exclusive right of fishery clause of section 15 remain in the constitution, the premise of the argument is that whatever system of limited entry is imposed must be one which, consistent with a feasible limited entry system, en-

---

16. A memo of the Committee on Resources defining terms states the following under "White Act Provisions 48 U.S.C.A. 222:"

    That every such regulation made by the Secretary shall be of general application within the particular area to which it applies, and that no exclusive or general right of fishery shall be granted therein, nor shall any citizen of the U.S. be denied the right to take, prepare, cure, or preserve fish or shellfish in any area of the waters of Alaska where fishing is permitted by the Secretary.... The word "exclusive" forbids not only a grant to a single person or corporation, but to any special group or number of people. (Hynes–Grimes Karluk Reservation)

    Alaska Constitutional Convention Papers, Folder 210.

17. Commentary on Article on State Lands and Natural Resources, 6 Proceedings of the Alaska Constitutional Convention at 87.

18. *See supra* pages 5 and 6.

19. Justice Rabinowitz states in his dissenting opinion that he does not interpret the statute to mean that "eligibility to participate in subsistence uses is determined solely with reference to where an individual lives." *Infra* at 17. That, however, clearly is the case with respect to first-tier subsistence users. Urban resident may not be subsistence users because subsistence uses are by definition limited to rural residents. AS 16.05.940(30), quoted *supra* at pp. 1–2. Yet all rural residents may be first-tier subsistence users without regard to their individual characteristics. The regulation on which Justice Rabinowitz relies, 5 AAC 99.010(b), defines customary and traditional uses but does not state that first-tier subsistence rights can be limited to customary and traditional users. As we stated in *Madison* "the phrase 'customary and traditional' modifies the word 'uses' ... it does not refer to users." 696 P.2d at 174. The state acknowledges that only in the second-tier subsistence context may individual characteristics separate those rural residents who may be second-tier subsistence users from those who are ineligible. Brief of Appellees, p. 8. The state also notes that the need for a second-tier limitation has, to date, not arisen. *Id.*

tails the least possible impingement on the common use reservation and on the no exclusive right of fishery clause. The argument concludes that free transferability does not entail the least possible impingement on the anti-exclusionist values which these provisions reflect.

... [T]he premise of this argument is logical.

*Id.* at 1191. We expressed the same theme in *Johns v. Commercial Fisheries Entry Commission,* 758 P.2d 1256 (Alaska 1988) concerning the obligation of the Commercial Fisheries Entry Commission to establish an optimum number of entry permits. We stated in *Johns:*

In [*Ostrosky*], we noted that there is a tension between the limited entry clause of the state constitution and the clauses of the constitution which guarantee open fisheries. We suggested that to be constitutional, a limited entry system should impinge as little as possible on the open fishery clauses consistent with the constitutional purposes of limited entry, namely, prevention of economic distress to fishermen and resource conservation. *Ostrosky* .... The optimum number provision of the Limited Entry Act is the mechanism by which limited entry is meant to be restricted to its constitutional purposes. Without this mechanism, limited entry has the potential to be a system which has the effect of creating an exclusive fishery to ensure the wealth of permit holders and permit values, while exceeding the constitutional purposes of limited entry. Because this risk of unconstitutionality exists, the [Commercial Fisheries Entry Commission] should not delay in embarking on the

optimum number process, except where there is a substantial reason for doing so. *Id.,* 758 P.2d at 1266 (footnote omitted).

Most recently in *Owsichek,* we suggested that section 17 of article VIII, the uniform application clause, "may require 'more stringent review' of a statute than does the equal protection clause in cases involving natural resources." *Owsichek,* 763 P.2d at 498 n. 17 (quoting *Gilman v. Martin,* 662 P.2d 120, 126 (Alaska 1983)). We also cited with approval Justice Rabinowitz's dissent in *Ostrosky,* 667 P.2d at 1196 which employs a least restrictive alternative approach in view of the "highly important interest running to each person within the state" by virtue of the common use clause. 763 P.2d at 492 n. 10.

In reviewing legislation which burdens the equal access clauses of article VIII, the purpose of the burden must be at least important. The means used to accomplish the purpose must be designed for the least possible infringement on article VIII's open access values. *Ostrosky, supra* at 1191, *Johns, supra* at 1266.

We employ this method of analysis in the present case as an alternative ground of decision. Using this approach, we conclude that the rural-urban residency criterion is unconstitutional for the reasons that follow.

One purpose of the 1986 act is to ensure that those Alaskans who need to engage in subsistence hunting and fishing in order to provide for their basic necessities are able to do so. This is an important interest.[20] However, the means used to accomplish this purpose are extremely crude. There are, as noted above, substantial numbers of Alaskans living in areas designated as urban who have legitimate claims as subsist-

---

**20.** Another expressed purpose is to aid communities whose residents are dependent on subsistence, as distinct from aiding the individual residents. This is not a purpose separate from aid to individual community members where the aid goes directly to the individuals. As we stated in *State v. Enserch,* 787 P.2d 624, 634 (Alaska 1989): "It would not make sense to conclude that a statute may not discriminate between residents of two areas in order to aid the residents of the more disadvantaged area, but that such a statute could discriminate between residents of

two areas in order to aid the communities in the more disadvantaged area. The communities are merely the collective sum of the residents."

A third purpose is to comply with ANILCA in order to retain state fish and game control on federal lands. It is difficult to view this as a sufficiently important purpose. ANILCA does not require state compliance. State control merely for the sake of control is a questionable goal when the terms infringe upon the open access values of article VIII.

ence users. Likewise, there are substantial numbers of Alaskans living in areas designated as rural who have no legitimate claims. A classification scheme employing individual characteristics would be less invasive of the article VIII open access values and much more apt to accomplish the purpose of the statute than the urban-rural criterion.

We note that several other jurisdictions have struck down intrastate residential preferences in fish and game statutes. These authorities support our view that the equal access clauses of article VIII, which are a special type of equal protection guaranty, bar the residential discrimination imposed in this case.[21] *Lewis v. State*, 110 Ark. 204, 161 S.W. 154 (1913) contains an excellent historical statement:

> When it becomes necessary for the propagation and preservation of wild game and fish for the use of the public, the people acting in their sovereign capacity, through their lawmaking power, may pass laws to regulate the right of each individual which he enjoys in common with every other member of the community to use of same. But when the sovereign undertakes to regulate or restrain the individual in its right as a member of the community to enjoy the right to take and use this common property of all, it must do so upon the same terms to all members of the community alike. The common right, which one individual of the whole community is entitled to enjoy as much as another, cannot be made by law the exclusive privilege of the people of a certain class or section upon terms and conditions that do not apply to the whole people alike. This right which one individual has in common with every other individual in the community to take and use fish and game, ferae naturae, is one that has existed from the remotest times, and, although at one time in England after the Norman Conquest the right to take fish and game was claimed as a royal prerogative to the exclusion of the people, it was restored to them by the Barons at Runnymede in 1215, and was declared in the great charter which they wrested from King John. "The rights," says Green, "which the barons claimed for themselves they claimed for the nation at large." Green's History of the English People, vol. 4, pp. 252–254.
>
> These rights were confirmed and established ever thereafter in England by acts of Parliament, and they have come down to us from the laws of England and may be regarded as a common heritage of the English-speaking people. *See Parker v. People*, 111 Ill. 581, 53 Am. Rep. 643. *Also Geer v. Conn.*, 161 U.S. 519, 16 Sup.Ct. 600, 40 L.Ed. 793; *Martin v. Waddell*, [41 U.S.] 16 Pet. 367, 10 L.Ed. 997. The only justification for a law regulating and restricting the common right of individuals to take wild

21. *See State v. Bryan*, 87 Fla. 56, 99 So. 327, 330 (1924) (state law levying $10 and $50 license tax on state residents who are non-residents of certain counties, as a prerequisite to hunting in those counties, when residents of those counties pay only $1 or $1.25, violates equal protection); *State v. Barkley*, 192 N.C. 184, 134 S.E. 454, 455 (1926) (state law levying $3 hunting fee on non-resident hunters in the county, and a $1 fee on residents of the county, held invalid in that it taxed inhabitants unequally); *Harper v. Galloway*, 58 Fla. 255, 51 So. 226, 229 (1910) (state law that required citizens of the state of Florida who were not residents of Marion County to give a previous notice of intention to hunt and to pay a special license tax for the privilege of hunting game in Marion County, while no notice or license tax was required of residents of Marion County, denied equal protection of the laws); *Bruce v. Director, Dep't of Chesapeake Bay Affairs*, 261 Md. 585, 276 A.2d 200, 208 (1971) (statutes prohibiting crabber from crabbing in waters of county other than his county of residence and prohibiting oystermen from going to waters of another county invalid); Power, *More About Oysters Than You Wanted To Know*, 30 Maryland L.Rev. 199, 218 (1970) ("A county non-resident represents no peculiar threat to the fishery but merely the same threat as represented by a county resident.").

*But see Commonwealth v. Hilton*, 174 Mass. 29, 54 N.E. 362, 364 (1899) (selectmen of a town may prohibit the digging of clams by nonresidents of the town); *State v. Norton*, 335 A.2d 607, 615 (Me.1975) (state had compelling governmental interest in conservation of its clams and its attempt to achieve that purpose by, in part, authorizing municipalities to apply a resident-nonresident standard in licensing shell fisheries did not unconstitutionally discriminate against nonresidents).

game and fish is the necessity for protecting the same from extinction, and thus to preserve and perpetuate to the individual members of the community the inalienable rights which they have had from time immemorial. While the state, holding the title to game and fish, so to speak, in trust for every individual member of the community, may pass laws to regulate the rights of each individual in the manner of taking and using the common property, yet, as we have already stated, this must be done, under the Constitution, upon the same terms to all the people. No special privileges or immunities can be conferred.

Where the necessity for the preservation of the wild game and fish exists in certain territories of the state, that territory may be segregated for the purpose of regulating the right to taking game and fish therein; *but the privilege of taking and using same must be extended to the people of the state outside of the territory upon the same terms that are given to those who are residents of the territory embraced in the legislation.* Hayes v. Territory, 2 Wash.T. 286, 5 Pac. 927. In the cases of *State v. Higgins*, 51 S.C. 51, 28 S.E. 15, 38 L.R.A. 561, and *Harper v. Galloway*, 58 Fla. 255, 51 South. 226, 26 L.R.A. (N.S.) 794, 19 Ann.Cas. 235, the question here involved was considered and determined in accord with the doctrine we have announced.

*Id.* 161 S.W. at 155–156 (footnote omitted, emphasis added).

## CONCLUSION

Our disposition of this case makes it unnecessary to discuss the other grounds advanced by appellants. For the above reasons, the judgment of the superior court is reversed. This case is remanded to the superior court with instructions to issue a declaratory judgment that the rural preference of ch. 52 SLA 1986 is unconstitutional and to take such further action as may be appropriate.

REVERSED and REMANDED.

COMPTON and MOORE, JJ., concurring.

RABINOWITZ, J., dissenting.

COMPTON, Justice, concurring.

I agree with Part A of the opinion, holding that this preferential scheme violates art. VIII, sections 3, 15 and 17 of the Alaska Constitution.

I express no opinion regarding Part B as it is superfluous to the decision.

MOORE, Justice, concurring.

The court correctly concludes that chapter 52, SLA 1986 ("the Act") violates the Alaska Constitution. I write separately to explain my understanding of the court's holding in part B of the section entitled "The Article VIII Clauses—History and Analysis," which I join, and because I disagree with the court's analysis in part A.

*Equal Protection*

The Act is motivated by a compelling purpose, ensuring that persons who are dependent upon subsistence hunting and fishing have access to wildlife. However, the Act's geographical classification scheme is only loosely related to that purpose. This is an equal protection case, and an easy one at that.

Article I, section 1 of the Alaska Constitution provides that "all persons are ... entitled to equal rights, opportunities, and protection under the law...." We have decided many cases interpreting this provision, most recently, *State v. Enserch Alaska Construction, Inc.*, 787 P.2d 624 (Alaska 1989). The Alaska Constitution has a similar clause specifically concerning natural resources. Article VIII, section 17, the uniform application clause, provides that "[l]aws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation."

When applying the equal protection clause of article I, we determine the impor-

tance of the individual interest affected by the enactment. The importance of the individual interest determines the level of scrutiny we apply to both the state's interest in the enactment and the nexus between that interest and the enactment. *Enserch*, 787 P.2d at 631–632; *Alaska Pacific Assurance Co. v. Brown*, 687 P.2d 264, 269–70 (Alaska 1984). Without explicitly acknowledging it, the court's opinion employs the same analysis under the uniform application clause of article VIII. *See supra* pp. 10–11. Since the principle of equality underlies both clauses, the use of our equal protection analysis in the uniform application context is proper.

I believe that the individual interest impaired by the Act, access to wildlife for subsistence purposes, is a species of the important right to engage in economic endeavor at issue in *Enserch*, at 632–633. *See also Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1266 (Alaska 1980). The challenged enactment therefore should receive close scrutiny.[1] The Act then at least must be closely related to an important state interest. *Enserch*, at 633.

The state's interest, ensuring that those who must engage in subsistence hunting and fishing are able to do so, is undoubtedly important. Indeed, I believe it is compelling. However, the Act's classification scheme for deciding who is entitled to engage in subsistence hunting and fishing and its implementing regulations are not closely related to the purpose of the Act. As the court's opinion describes, large numbers of residents of areas classified as urban under the Act are dependent upon subsistence hunting and fishing. Conversely, some of the state's larger cities, where many people are not dependent upon subsistence hunting and fishing, are classified as rural. *Supra* pp. 4–5. There is only a modest correlation between the set of people who reside in areas designated as rural under the Act and the set of people who are dependent upon subsistence hunting and fishing. The fit between the Act and the state's interest does not even approach that required to withstand close scrutiny. Therefore, the Act violates the equal protection and uniform application clauses of the Alaska Constitution.

This is not to say that all subsistence preference laws would be unconstitutional. I simply believe that for such a law to pass constitutional muster, it must be closely related to its compelling purpose. A law providing for individual determinations of eligibility would in my view be sufficiently tailored to the state's interest to withstand a constitutional challenge.

### Common Use and Exclusive Right of Fishery

The court's holding in Part A of the section entitled "The Article VIII Clauses—History and Analysis" is not altogether clear. I agree with the court to the extent that it holds that an intrastate geographical preference for the taking of wildlife violates sections 3 and 15 of article VIII of the Alaska Constitution. I reject any implication that all preferences, especially all subsistence preferences, would violate these sections. I do not believe that the court can find a violation of article VIII, section 17 without a full equal protection analysis. I do not join part A of the court's opinion, but I concur in its result.[2]

Section 15 of article VIII provides that "[n]o exclusive right *or special privilege* of fishery shall be created or authorized in the natural waters of the State." Alaska Const., art. VIII, § 15 (emphasis added). Section 4 of article VIII provides that the use of resources shall be "subject to preferences among beneficial uses." On the surface, there appears to be some conflict between these provisions. To the greatest

---

1. *Enserch*, at 633; *Patrick v. Lynden Transp., Inc.*, 765 P.2d 1375, 1379 (Alaska 1988). It may be that the enactment should receive even greater scrutiny under the uniform application clause; however, the court has not decided that question. *Owsichek v. State*, 763 P.2d 488, 498 n. 17 (Alaska 1988).

2. I would not, however, reach this question, because I believe that such geographical preferences violate the equal protection and uniform application clauses of the Alaska Constitution.

extent possible, we must interpret the provisions of Article VIII consistent with each other. *See Abrams v. State*, 534 P.2d 91, 95 (Alaska 1975).

Section 4 clearly authorizes some preferences based upon uses. The court recognized a parallel exception to section 15 in *Kenai Peninsula Fisherman's Cooperative Association, Inc. v. State*, 628 P.2d 897 (Alaska 1981), where we wrote that section 15 "was not meant to prohibit differential treatment of such diverse user groups as commercial, sports, and subsistence fishermen." 628 P.2d at 904. The Act distinguishes subsistence uses from commercial and sport uses in name only. As discussed above, its classification is in fact a fairly arbitrary one based upon residence. It is not the type of classification we have previously held permissible under section 15.

We are left with the question whether geographical preferences are permissible under section 15. For the reasons given in the court's opinion, *see supra* pp. 6–8, I believe that reliance upon *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231 (1949), which interpreted the federal statute upon which section 15 was based, is appropriate. In *Hynes*, the Court invalidated regulations prohibiting fishing off the shores of the Karluk Reservation. While I do not believe that *Hynes* is determinative since it involved an exclusive right to fish in a particular area and not a mere preference, 337 U.S. at 92, 69 S.Ct. at 973, section 15 proscribes "special privilege[s]" as well as exclusive rights. Like the court, I do not read *Hynes* as being based on the fact that the exclusive right was granted to Natives rather than some other group. Nor do I believe that *Hynes* can be distinguished by the ability of people to move to rural areas and thus qualify under the Act. *See supra* pp. 7–8 & n. 12. For these reasons, I agree with the court that geographical preferences for the taking of fish are not permissible under section 15. The Act thus violates section 15. Although section 15 is facially applicable only to fishing,

I would have no difficulty finding a corresponding prohibition of geographical hunting preferences in the common use clause of article VIII, section 3. *See supra* p. 9.

RABINOWITZ, Justice, dissenting.

I dissent from the court's holding that ch. 52 SLA 1986 is unconstitutional.[1] In my view Alaska's subsistence laws are not violative of either section 3 ("common use"), section 15 ("no exclusive right of fisheries"), or section 17 ("equal application of laws") of article VIII of the Alaska Constitution.

Article VIII, section 4 explicitly provides for "preferences among beneficial uses." In *Kenai Pen. Fisherman's Co-op Ass'n v. State*, 628 P.2d 897, 904 (Alaska 1981), we said in part: "[w]hile section 15 does prohibit granting monopoly fishing rights, that section was not meant to prohibit differential treatment of such diverse user groups as commercial, sport, and subsistence fishermen." The subsistence laws at issue here do not exclude individuals from access to wildlife; rather, wildlife resources are allocated on a preferential basis. Nor do these laws create an exclusive right of fishery in any class. Rather, the effect of these laws is to provide for a subsistence preference among beneficial users of the resource. No exclusive, monopolistic, or otherwise closed classes of resource users are established.

I would further hold that ch. 52 SLA 1986 is not violative of the equal protection provisions of the Alaska Constitution (article I, section 1, article VIII, section 17). In my view adoption of the strict scrutiny and least restrictive alternative standards is inappropriate. Given the nature of the interest at stake I would apply a lesser standard for purposes of equal protection analysis. This subsistence legislation is substantially related to legitimate legislative goals. I conclude that the fit between the legislature's goal of furthering the health and welfare of subsistence users, and the subsistence preference system it devised to carry out this objective, is sufficiently close

---

1. Hereinafter state subsistence laws.

to withstand scrutiny under Alaska's equal protection provisions.

INTRODUCTION.

In response to the impact the state's population growth has had upon subsistence lifestyles, Congress in 1980 enacted the Alaska National Interest Lands Conservation Act (hereinafter ANILCA or federal subsistence law).[2] ANILCA was designed to protect subsistence hunting and fishing by giving such uses priority over commercial and sport uses in rural areas.[3]

The federal subsistence law specified that subsistence uses must be "customary and traditional uses by *rural* Alaska residents." ANILCA § 803; 16 U.S.C. § 3113 (emphasis added). Thus, under ANILCA, eligibility for subsistence permits was dependent in part upon one's geographic place of residence. ANILCA § 804; 16 U.S.C. § 3114.[4]

ANILCA authorized the state to continue managing fish and game inhabiting Alaska's federal lands and waters if the state established regulations maintaining the definition of and preference for subsistence uses articulated in the federal subsistence law. ANILCA § 805(d); 16 U.S.C. § 3115(d). The state legislature complied, and thereby retained managerial control over federal lands located within the state by authorizing the Joint Boards of Fish and Game to promulgate regulations defining "rural" use.

In enacting ch. 52 SLA 1986 the Alaska House of Representatives adopted a letter of intent.[5] The letter articulated the subsistence-rural preference of the act in the following terms:

This limitation of the definition of "subsistence uses" recognizes that Alaska is unique, and unlike any of the other forty-nine states, the economy of many rural communities in rural areas in Alaska is significantly dependent upon participation by the residents of the communities in the taking of fish stocks and game populations for personal and family consumption. Further, the legislature finds that the general health and welfare of these citizens is significantly tied to their participation in these activities.[6]

The subsistence statutes challenged here define "rural area" as "a community or area of the state in which the noncommercial, customary, and traditional use of fish or game for personal or family consumption is a principal characteristic of the economy of the community or area." AS 16.05.-940(25).

Appellants' basic contention here is that "by excluding from eligibility as subsistence users all urban dwellers and by including all rural dwellers, it unfairly excludes some urban residents who have lived a subsistence lifestyle and desire to continue to do so, while needlessly including numerous rural residents who have not engaged in subsistence hunting and fishing." The

2. Pub.L. No. 96–487, 94 Stat. 2371 (1980); 16 U.S.C. §§ 3101–3233 (West 1985). Congress prefaced Title VIII of ANILCA with a declaration that "the continuation of the opportunity for subsistence uses by rural residents of Alaska ... is essential to Native physical, economic, traditional, and cultural existence...." 16 U.S.C. § 3111(1).

3. *See* 16 U.S.C. §§ 3111–3126 (1982 & Supp. IV 1986).

4. "Rural" areas are those with sparse populations, and the term "rural" as used in ANILCA is not a term of art. *Kenaitze Indian Tribe v. State of Alaska,* 860 F.2d 312 (9th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3187, 105 L.Ed.2d 695 (1989), (term "rural" is to be given its ordinary significance, meaning "sparsely populated").

5. 1985 House Journal 1246.

6. *See also* the House Committee on Interior and Insular Affairs Report issued in conjunction with the passage of ANILCA.

After consideration of the testimony at the subcommittee's hearings and town meetings throughout Alaska and review of studies done by a variety of federal, state, academic, and other agencies and groups, the Committee has no doubt about the importance of subsistence uses to the rural people of Alaska. Reliable evidence was given to the Committee demonstrating that fifty percent of the food for three-quarters of the Native families in Alaska's small and medium villages is acquired through subsistence uses, and 40% of such families spend an average of 6 to 7 months of the year in subsistence activities....

H.R.Rep. No. 1045, 95th Cong., 2d Sess., at 181 (1978).

linchpin of this dispute, then, is whether the challenged subsistence law constitutes an unconstitutionally imperfect attempt to fulfill the legislature's purpose of protecting subsistence uses.

## I. DO ALASKA'S SUBSISTENCE LAWS VIOLATE ARTICLE VIII OF THE ALASKA CONSTITUTION?

Appellants challenge the constitutionality of the state subsistence laws under three clauses of article VIII of the Alaska Constitution, sections 3 ("common use"), 15 ("no exclusive right of fisheries"), and 17 ("equal application of laws").[7] The court attributes a "shared meaning" to these three constitutional provisions: that "exclusive or special privileges to take fish and wildlife are prohibited." The court then concludes that the subsistence statute's preference for rural residents violates each of the aforementioned clauses and offends the shared meaning of article VIII. I disagree.

### A. Section Three: The "Common Use" Clause.

Article VIII, section 3 (the "common use" clause) is derived from laws designed to guarantee the common citizen participation in wildlife harvest, and to divest the Crown of exclusive entitlement to those resources.[8] It is said that this "public trust" doctrine[9] "impose[s] upon the state a trust duty to manage the fish, wildlife and water resources of the state for the benefit of all the people." *Owsichek v. State*, 763 P.2d 488, 495 (Alaska 1988) (citations omitted); *see also Metlakatla Indian Community, Annette Island Reserve v. Egan*, 362 P.2d 901, 905 (Alaska 1961), *aff'd*, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962); *Herscher v. State, Dep't of Commerce*, 568 P.2d 996, 1003 (Alaska 1977).

In *State v. Ostrosky*, 667 P.2d 1184 (Alaska 1983), *reh'g denied*, 468 U.S. 1204, 104 S.Ct. 3572, 82 L.Ed.2d 871 (1984), we accepted the view that the common use clause reflects "anti-exclusionist values." *Id.* 667 P.2d at 1191. Thereafter, in *Owsichek v. State*, 763 P.2d 488 (Alaska 1988), a case involving an exclusive right to conduct guided hunting in particular areas of wilderness, we reiterated this theme stating that section 3 is fundamentally "anti-monopoly" in its thrust. *Id.* at 493 ("Because an EGA [exclusive guide area] is clearly a type of monopoly ... [legislative] history strongly suggests that the statutes at issue here are unconstitutional."). Critical to our holding that the guide licensing system at issue in *Owsichek* was unconstitutional under the common use clause were the following characteristics of the scheme: it per-

---

7. Section 3 of article VIII provides:
   Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.
   Section 15 of article VIII provides:
   No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State. This section does not restrict the power of the State to limit entry into any fishery for the purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the State.
   Section 17 of article VIII provides:
   Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation.

8. In *Lewis v. State*, 110 Ark. 204, 161 S.W. 154 (1913), the court described the history of the common use principle in the following terms:

[A]lthough at one time in England after the Norman Conquest the right to take fish and game was claimed as a royal prerogative to the exclusion of the people, it was restored to them by the Barons at Runnymede in 1215, and was declared in the great charter which they wrested from King John.

\*   \*   \*   \*   \*   \*

These rights were confirmed and established ever thereafter in England by acts of Parliament, and they have come down to use from the laws of England and may be regarded as a common heritage of the English-speaking people.

*Id.* at 155 (citations omitted).

9. The public trust doctrine maintains that government holds untaken wildlife in trust for public use, and that government owes a fiduciary duty to manage such resources for the common good of the public as beneficiary. *See Owsichek v. State*, 763 P.2d 488, 493–95 (Alaska 1988).

mitted a single guide permanently to exclude all other guides from leading hunts professionally on specific lands; it favored established guides at the expense of new entrants in the guiding market; it created a salable, property-like interest in the license; and it established exclusivity of an unlimited duration. *Id.* at 496.

In the case at bar the challenged subsistence laws exhibit none of these characteristics. The state subsistence laws establish a subsistence preference, not an exclusive, monopolistic, or otherwise closed class. Anyone may join subsistence users by moving to a sector of the state which has been designated as a "rural area." Further, these laws do not establish subsistence hunting and fishing as an exclusive use, even in rural areas, except during periods of extreme resource scarcity.[10] In regard to this issue I think the court's reliance on *Owsichek* and *Ostrosky* is misplaced. Both *Owsichek* and *Ostrosky* emphasize that the primary thrust of article VIII is anti-exclusionist or anti-monopolistic, not anti-preferential.

I do not read the statutes in question as providing that eligibility to participate in subsistence uses is determined solely with reference to where an individual lives. That is not the case. The subsistence laws at issue here are implemented by multi-factoral regulations which focus not only on place of residence, but also upon particular stocks and populations of fish and game, and particular patterns of subsistence usage.[11] Moreover, individual characteristics are always considered under the state subsistence law during lean periods when it becomes necessary to restrict even certain subsistence uses. In those periods, the determination as to which individuals among those normally eligible for a subsistence permit may continue harvesting is made on the basis of an analysis of individuals' characteristics under the following criteria: (1) customary and direct dependence on the resource as the mainstay of livelihood; (2) local residence; and (3) availability of alternative resources. AS 16.05.258(c).

The court's interpretation of the common use clause would prohibit the legislature from making any differential allocation of natural resources whatsoever, an outcome precluded by our holding in *Kenai Peninsula*, 628 P.2d 897 (Alaska 1981) and the language of article VIII, section 4, which explicitly provides for "preferences among beneficial uses." In *Kenai*, we held that "[w]hile section 15 does prohibit granting monopoly fishing rights, that section was not meant to prohibit differential treatment of such diverse user groups as commercial, sport, and subsistence fisherman." 628 P.2d at 904 (emphasis added).

Moreover, it is axiomatic that the provisions of article VIII of the Alaska Constitution should be interpreted so as to avoid internal contradictions. *Abrams v. State*, 534 P.2d 91, 95 (Alaska 1975) ("It is an undisputed maxim of constitutional construction that the different provisions of the document shall be read so as to avoid conflict whenever possible"); *Park v. State*, 528 P.2d 785, 786–87 (Alaska 1974) ("It is a well accepted principle of judicial construction that, whenever reasonably possible, every provision of the Constitution should be given meaning and effect, and related provisions should be harmonized."). In my view the court's reading of article VIII, section 3 as prohibiting preferences among beneficial uses of Alaska's resources plainly conflicts with article VIII, section 4. That section provides, in full:

> Fish, forests, wildlife, grasslands, and all other replenishible resources belonging to the State shall be utilized, developed, and maintained on the sustained yield

---

**10.** Alaska Statute 16.05.258(c) authorizes complete prohibition of non-subsistence uses during periods of famine when the state's total harvest is insufficient to support even normal subsistence uses.

**11.** Subsistence uses must be "customary and traditional" uses as determined by the separate Boards after evaluation of a particular fish or game stock in light of eight criteria. 5 AAC 99.010(b). These eight criteria include examination of individual populations' patterns of use, methods and efficiency of use, consistency of use, and methods of food storage, as well as the nexus between the asserted subsistence use and the maintenance of individuals' cultural heritage. *Id.*

principle, *subject to preferences among beneficial uses.*

(Emphasis added.) The intent of section 4 is that persons situated differently can be treated differently and that some users of a resource may legitimately be given preference over others.

In brief, the common use clause constitutionalized the doctrine that wild fish and game are held in trust by the state for the benefit of the public as a whole, rather than by the sovereign in exclusive possession. That principle is consistent with the view that the sovereign state may manage wildlife for the common good, including certain beneficial preferences. Thus I conclude that the challenged subsistence laws do not offend the anti-monopolistic, anti-exclusionist values underpinning the public trust and common use doctrines embodied in section 3 of article VIII of Alaska's constitution.

B. *Section 15: the "No Exclusive Right" Clause.*

I also disagree with the court's holding that the state subsistence law violates article VIII, section 15 (the "no exclusive right" clause).

The court relies for its interpretation of the no exclusive right clause upon *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231 (1949), a case in which the United States Supreme Court interpreted the federal legislation which governed Alaska's fisheries before statehood, former 48 U.S.C. §§ 221–224 (1941) (hereinafter "The White Act"). The White Act did include language seemingly prohibitive of the kind of geographic distinction at issue here. Section 1 of the White Act provides, in relevant part:

> [N]o exclusive or several right of fishery shall be granted ... nor shall any citizen of the United States be denied the right to take, prepare, cure, or preserve fish or shellfish *in any area* of the waters of Alaska where fishing is permitted by the Secretary of the Commerce.

Act of June 6, 1924, Ch. 272, § 1, 43 stat. 464 (emphasis added). On the other hand, I disagree with the court's view that insofar as the White Act was expressly anti-geographic, section 15 should be given a similar construction. For in my opinion *Hynes* is distinguishable in several important respects.

First, *Hynes* did not involve an allocation of fish and game on the basis of residence; rather, the exemption at issue there applied only to fish, and was predicated upon the users' status as Indians, not their place of residence. 337 U.S. at 89–97, 69 S.Ct. at 971–976. Second, *Hynes* involved an exclusive right of access which had been made available only to a closed class of fishermen. At issue in *Hynes* was a regulation of the Secretary of the Interior completely prohibiting commercial salmon fishing in all waters within 3,000 feet of the shores of the Karluk reservation, but exempting Native fishermen from this otherwise comprehensive ban. *Id.* Therefore, *Hynes*, like *Owsichek*, is distinguishable from the classification scheme at issue in the present case, since in the case at bar one may become eligible for subsistence permits by moving into a rural area. Finally, as noted previously, both article VIII, section 4 and *Kenai Fisherman's* establish that section 15 cannot be read to prohibit differential treatment of such diverse user groups as commercial, sport, and subsistence users.

C. *Section 17: the "Equal Application" Clause.*

Although section 17 (the "equal application clause") is a component of article VIII, it is essentially, as the court states, a " 'more stringent ...' equal protection clause [for] ... cases involving natural resources." I will address these issues together.

II. DO THE 1986 STATE SUBSISTENCE LAWS VIOLATE ARTICLE VIII, SECTION 17 OR THE EQUAL PROTECTION CLAUSE OF THE ALASKA CONSTITUTION (ARTICLE I, SECTION 1)?

The court holds the state subsistence laws unconstitutional on equal protection

grounds.[12]

Although this court has not yet addressed the issue whether equal access to fish and game is a fundamental right, we have held that commercial fishing is not fundamental. *Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1262 (Alaska 1980). Other courts have concluded that recreational hunting is not a fundamental right. *See, e.g., Baldwin v. Montana Fish and Game Comm'n*, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978) (elk hunting by non-residents not fundamental); *Utah Public Employees Ass'n v. State*, 610 P.2d 1272 (Utah 1980) (entry in big game permit drawing not fundamental). *See also Herscher v. State, Department of Commerce*, 568 P.2d 996, 1003, 1006 (Alaska 1977).

In my view, the interest at stake, i.e., the right to participate in subsistence hunting and fishing, is not a fundamental right. Maximum scrutiny is reserved for fundamental rights and suspect classifications. *Ostrosky*, 667 P.2d at 1192. Given what I perceive to be the appropriate characterization of the interest involved, the state must demonstrate the existence of a substantial relationship between the means utilized by the legislation and the legitimate governmental ends sought to be achieved thereby.

Since I am of the view that strict scrutiny is inapplicable, I conclude that the questioned legislation does not violate the Alaska Constitution's equal protection clause. The challenged subsistence laws are fairly and substantially related to the important governmental goal of protecting the health and welfare of the state's subsistence users, a goal admittedly within the state's police powers to pursue.[13]

Implicit in my view that this legislation is not violative of equal protection is the further conclusion that the subsistence classification formulated to fulfill this concededly legitimate legislative purpose is not constitutionally infirm. As we said in *Apokedak*, 606 P.2d at 1267:

> [I]ndividual cases will arise in which those barred may be able to show extreme hardship. The legislature in its wisdom could conceivably have better provided for such instances. But equal protection, even under Alaska's stricter standard, does not demand perfection in classification. If it did, there would be few laws establishing classifications that would sustain an equal protection challenge.

The subsistence legislation in question here effectively captures within its ambit the thousands of subsistence users residing in Alaska's numerous rural villages. In short, I would hold that the subsistence laws' fit satisfies the requirements of equal protection under both article I, section 1, and article VIII, section 17 of the Alaska Constitution.

---

**12.** The majority opinion employs article VIII section 17 and the concurring opinion of Justice Moore uses article I section 1. As Justice Moore points out, the method of analysis in either case is the same. Because Alaska's equal protection standards are more stringent than the federal constitutional standard, any statute which passes muster under Alaskan law will also survive the equal protection clause of the United States Constitution. *Herrick's Aero–Aqua Repair v. Department of Transportation*, 754 P.2d 1111, 1114 (Alaska 1988). Therefore, discussion of the federal standard is omitted.

**13.** As mentioned previously, in enacting the state subsistence laws, the Alaska legislature explicitly found that "the general health and welfare of these citizens is significantly tied to their participation in [subsistence] activities." 1985 House Journal 1246. In a similar vein this court said in *State v. Tanana Valley Sportsmen's Ass'n*, 583 P.2d 854, 859 n. 18 (Alaska 1978):

> ... For hundreds of years, many of the Native people of Alaska depended on hunting to obtain the necessities of life. To this day, despite incursions by those of different cultures, many Alaska Eskimos, Indians and Aleuts eke out a livelihood by reliance on fish and game.... Not only is the game of prime importance in furnishing the bare necessities of life, but subsistence hunting is at the core of the cultural tradition of many of these people....