KWETHLUK IRA COUNCIL, Plaintiff,

v.

STATE OF ALASKA and Don W. Collinsworth, in his official capacity as Alaska's Commissioner of Fish and Game, Defendants.

No. A90–107 Civ.

United States District Court,
D. Alaska.

April 4, 1990.

---

**20.** I reserve the right to amend this opinion if the circumstances warrant.

John Starkey, Bethel, Ak., for plaintiff.

Lance B. Nelson, Asst. Atty. Gen., Anchorage, Ak., for defendants.

## PRELIMINARY INJUNCTION

HOLLAND, Chief Judge.

Plaintiff is an Indian Reorganization Act Council for the Native Village of Kwethluk, Alaska. Plaintiff seeks a temporary restraining order and preliminary injunction pursuant to this court's jurisdiction and authority under the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. § 3117.

By its complaint and the instant motions, plaintiff seeks to secure for its members from the defendants an emergency caribou hunt allowing the taking of 50 to 70 animals. It is undisputed that plaintiff's members are rural residents of Alaska entitled to subsistence hunting rights under Alaska's subsistence law, AS 16.05.258. It is undisputed that plaintiff's members have customarily and traditionally hunted the Kilbuck Mountains caribou herd. It is undisputed that plaintiff's members would, under normal circumstances, have use for at least 50 caribou.

All hunting of the Kilbuck herd has been suspended since 1985 because the herd had decreased to less than 100 animals. That herd has now increased to 1,400 or more animals, and there is testimony before the board that the taking of 100 animals would not damage the herd.

Because of economic conditions in the Village of Kwethluk and the failure of other food sources in the area, plaintiff sought from the Alaska Game Board an emergency hunt. The board concluded that there was an emergency situation and considered plaintiff's application under these circumstances. The board denied plaintiff's application, based first upon a "policy decision" that the hunt was not in the long-term best interests of the Kilbuck herd.[1] It was the view of the board that all hunting should remain suspended in order that the herd might further expand. Secondly, the board also concluded and based its decision upon advice that any opening for a hunt of the Kilbuck herd would likely lead to excessive and uncontrolled harvest of that herd. The latter conclusion appears to have been founded upon the decision of the Alaska Supreme Court in *McDowell v. State*, 785 P.2d 1 (Alaska 1989). Although the latter decision of the Alaska Supreme Court has been stayed, the court's stay order precludes the adoption of further regulations by the state game regulators with respect to subsistence hunting unless such hunting is opened to all residents of the State of Alaska.

By agreement of counsel at the April 2, 1990, hearing on plaintiff's motion for a temporary restraining order, the court took up and has ruled upon both the motions for a temporary restraining order and for a preliminary injunction.

The primary focus of plaintiff's complaint and the instant motions is the matter of whether the Kilbuck herd will support the taking of 50 to 70 animals. Plaintiff contends that it will. Defendants in substance contend that any hunting of this herd would be inconsistent with the statutory requirement that game populations be managed on a "sustained yield" basis. AS 16.05.258(b).

The game board made its "policy decision" as to plaintiff's application in this instance in the absence of any formal game management plan for the Kilbuck herd and in the absence of any articulated definition of the critical statutory term: "sustained yield". Both AS 16.05.258 and ANILCA, 16 U.S.C. § 3111, *et seq.*, are founded upon the perpetuation of both subsistence hunting and game populations. The court concludes that the term "sustained yield" is potentially broad enough to include authori-

---

1. Exhibit 1, Defendants' Opposition to Motion for Temporary Restraining Order and Preliminary Injunction. It has not escaped the court's attention that when this suit was filed and when the court first conferred with counsel on March 31, 1990, with respect to this case, the board had ostensibly concluded its consideration of plaintiff's application without making any findings of fact or conclusions of law. After the absence of such findings were discussed with the court, the board saw fit to make the findings which are herein discussed.

ty in the game board to restrict even subsistence hunting in order to rebuild a damaged game population. However, the board does not have absolute discretion in this area. There must be a balance of minimum adverse impact upon rural residents who depend upon subsistence use of resources and recognized scientific principles of game management. 16 U.S.C. § 3112(1) and (2).

The board having put in place neither a game management plan for the Kilbuck herd nor an articulated and evenly applicable definition of sustained yield, the board and, in its turn, this court have no meaningful standard against which to measure plaintiff's application for a subsistence hunt. The game board appears to have acted not on the basis of a formulated policy, but rather in an *ad hoc* fashion, as though it had unfettered discretion to decide what meaning it would attribute to the sustained yield issue in any particular case.

The court has concluded that plaintiff is likely to prevail upon the merits of its complaint and that the balance of hardships associated with the denial of the hunt sought by plaintiff tips dramatically in plaintiff's favor. The court also concludes that the possibility of harm to defendants is minimal, given the limited nature of the application. Moreover, the public interest strongly favors the continuation of subsistence hunting when, as in this instance, there is no compelling evidence that the hunt herein authorized will adversely affect the Kilbuck herd. Moreover, the court concludes that the game board, as a matter of state law and policy, may have been in a position where it could not issue an emergency subsistence regulation. However, the *McDowell* decision would not appear to preclude the state from the issuance of 50 general caribou hunting permits in an emergency situation. For the foregoing reasons, and for the further reasons stated orally by the court on the record at the conclusion of the hearing on April 2, 1990, plaintiff's motion for a temporary restraining order and preliminary injunction are granted.

IT IS HEREBY ORDERED THAT:

(1) Beginning no later than April 5, 1990, the State of Alaska, through the Department of Fish and Game, shall make available at Kwethluk on a first-come, first-served basis, special registration permits for the taking of caribou to Kwethluk residents with valid hunting licenses. No more than fifty (50) special registration permits may be issued. No more than two (2) special registration permits may be issued to any one person. A person participating in this hunt shall have in his possession a permit for every caribou taken; that is, subject to the other conditions herein set forth, one (1) caribou may be taken for each permit.

(2) In requesting permits, Kwethluk residents shall bear in mind that the hunt herewith authorized is subject to the annual bag limit of four (4) caribou. Persons who already have exhausted this bag limit are not eligible for this hunt.

(3) The season herewith authorized shall be limited to antlerless caribou only.

(4) The special registration permits will authorize the taking of caribou in that portion of Game Management Unit No. 18 south of the Yukon River, and more particularly described as follows:

Beginning at Elbow Mountain (Eluwaktak), southeast to Breast Mountain, thence east to Crooked Creek, thence north to a point on the Kisaralik River located six miles upstream from the upper falls, thence northwest to Shining Dome, thence southwest to the point of beginning.

(5) The season will close at 12:00 midnight on April 15, 1990, or (by emergency order of the department) when fifty (50) caribou have been taken, whichever is sooner.

(6) The Department of Fish and Game shall provide plaintiff with the names of the persons to whom special registration permits are issued, as well as the number of permits issued to each such person.

(7) Each permit holder shall report to the Kwethluk IRA Council in person or by telephone within forty-eight (48) hours after the taking of a caribou or, in the event the

permit holder is unsuccessful, within forty-eight (48) hours of the season closure. The Kwethluk IRA Council shall promptly upon receipt of such information convey the same to the Department of Fish and Game.

(8) The United States Fish & Wildlife Service may assist in the administering of the hunt, including, but not limited to, field enforcement.

Due to the nature of this case and the parties, no bond is required for this preliminary injunction.