*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ANN ELLINGSON and JOANNE DORMAN, Co-Personal Representatives of the Estate of CHARLES HUGH DORMAN, Deceased, | ) ) ) ) ) | Supreme Court No. S-14884 Superior Court No. 3AN-10-04586 CI |
| Appellants, | ) ) ) | O P I N I O N No. 6977 – December 26, 2014 |
| v. | ) ) | |
| DENBY LLOYD, Commissioner, Alaska Department of Fish and Game; ALASKA DEPARTMENT OF FISH AND GAME; CLIFF JUDKINS, Chair, Alaska Board of Game; ALASKA BOARD OF GAME, | ) ) ) ) ) ) ) | |
| Appellees. | ) ) ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Sen K. Tan, Judge.

Appearances: Thomas E. Meacham, Law Office of Thomas E. Meacham, Anchorage, for Appellant. Dario Borghesan, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellees.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

# I.    INTRODUCTION

This appeal challenges the efforts of the Alaska Board of Game[1] to control, by regulation, the movement of bison that stray outside the boundaries of two game ranches on Kodiak Island. The Board has statutory authority to determine when a domestic animal becomes "feral," and thus legally characterized as "game." Pursuant to this grant of authority, however, the Board's regulatory definition of a "feral" domestic animal must be reasonable and consistent with its authorizing statute.

The Board amended the first regulation at issue to read: "Under this section, and in accordance with the definition of 'game' [provided in statute,] (which includes feral domestic animals) . . . musk oxen, bison, or reindeer that [are] lawfully owned . . . that [are] not confined or [are] not under positive control [are] feral unless the animal is a free-ranging animal *on* a state or federal grazing lease."[2] The Board amended a second regulation to authorize the Alaska Department of Fish and Game[3] to announce a public hunt of bison in Unit 8 — which includes Kodiak — by emergency order.[4] These amendments effectively confiscated lawfully owned domestic animals, unreasonably transforming them from "domestic" to "game" solely by reference to a property boundary line.

---

[1]    We refer to the "Board" when we discuss the Board's authority and actions; we refer to the "State" when discussing the State as the party in this case.

[2]    5 Alaska Administrative Code (AAC) 92.029(d)(2) (2007) (emphasis added).

[3]    We refer to the Department of Fish and Game as the "Department" throughout this opinion. We refer to all other State departments by their full name.

[4]    5 AAC 85.010(a)(1) (2007).

We therefore reverse the superior court's grant of summary judgment in favor of the State and hold the contested regulations invalid. We also vacate the court's award of attorney's fees to the State.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Charles Dorman was one of two bison ranchers on Kodiak Island. He possessed two grazing leases from the State of Alaska issued under the authority of AS 38.05.070-.105;[5] his unfenced land totaled approximately 45,100 acres. Dorman ran approximately 200-225 bison on his Department of Natural Resources leases, which stretched across remote areas in the vicinity of Saltery Cove. Dorman's bulls, cows, and calves ranged in worth from $800-$4,000 each. He purchased his original 30 bison from a commercial domestic livestock owner in Homer and subsequently bred that stock.

The other bison rancher on Kodiak ran his bison in the area of Narrow Cape. Due to distance and terrain the two herds did not intermingle. Bison are not indigenous to Kodiak, but the Department of Fish and Game strongly supported the use of bison as an alternative to cattle because bison can better resist bear attacks. Both ranchers raised bison for slaughter and for commercial private hunts. The two ranchers did not mark, tag, or brand their bison so as to preserve the quality of the hunt.

Portions of Dorman's leases covered tidal flats. The tidal flats' soft earth could not physically support the installation and maintenance of a fence to confine the bison on Dorman's grazing leases, and Dorman's leases did not require fencing. Fencing also risked impeding the movement of indigenous Kodiak bears and other wildlife. Consequently, during certain times of the year at low tide, a herd of 50-150 of Dorman's

---

[5]    These statutes authorize the Department of Natural Resources to lease public land other than for the extraction of natural resources under the Alaska Land Act. *See also* AS 38.05.005.

bison strayed roughly six miles off his leased land into the Wild Creek/Hidden Basin area of state land, where the terrain prevented them from wandering further.[6] Dorman asserted the wayward bison eventually returned on their own or, within a few weeks, someone alerted him of the situation and he took steps to herd the bison back onto his lease. The State alleged that Dorman's bison strayed and remained off lease for as many as five years at a time.

At a meeting in March 2007, the Board of Game considered a regulatory proposal seeking to amend the then-existing regulation to establish hunts of "feral" bison on Kodiak. The proposal aimed to limit the expansion of "feral" bison herds throughout the area by allowing the public to hunt them. The Board heard testimony that the proposal would only affect Dorman and the other rancher. Dorman submitted written comments to the Board. Department biologist Larry Van Daele explained that, while the amendments changed the definition of "feral[,] . . . we know who [these bison] belong to." Van Daele informed the Board that Dorman's bison were getting "farther and farther away [from his lease]" such that "if they're not contained soon, they probably never will be"; Van Daele explained that the amendments aimed to "take care of this feral animal in the most efficient [way] possible." Van Daele stressed that there was "quite a bit of destruction or alteration of the habitat" in the Hidden Basin wetlands where Dorman's bison wintered, but Van Daele also stated that "Kodiak tends to heal itself a lot quicker than the tundra does, just the nature of the habitat down there." Van Daele could not "say honestly that there [were] any detrimental impacts [to deer or bears]

---

[6] In his comments to the Board at its 2007 meeting that approved the at-issue amendments, Department biologist Larry Van Daele estimated that Dorman's trespassing bison numbered roughly 100-150 at any given time. A United States Department of the Interior aerial survey conducted in November 2009 estimated that the off-lease herd was roughly 50 bison at that time.

right now," but there was concern that Dorman's bison would wander into the Kodiak Wildlife Refuge nearby or infect deer with a communicable disease in the future.

> The Chairman of the Board complained:

> [I]t bothers the heck out of me that [the Department of Natural Resources] hasn't stepped up to the plate and taken on their responsibility. They're the ones that [are] managing this lease, and they're the ones that ought to be taking care of the animals. It shouldn't be shoved on [the] Department of Fish and Game to deal with this, budgetwise or any otherwise. It's [the Department of Natural Resources'] problem.

The Chairman also noted that, in his experience with cattle leases on Bureau of Land Management property in the state, "when a herd of 10 bulls [went] . . . 10 miles down the road" the Board stayed completely out of it because the bulls were not "wild animal[s]."

An attorney from the Department of Law discussed an earlier amendment to 5 AAC 92.029(d), which he stated took effect in response to a situation in the Delta area where domestic bison intermingled with a wild bison herd. His recollection was that the Board decided to amend 5 AAC 92.029(d) to "put the burden . . . on the domestic rancher to establish ownership" of the bison and concluded, "[W]e're going to say they're feral as soon as they're off your property, out of your control. We'll give you a chance, if you're basically in hot pursuit, to recover them."

After lengthy deliberations, the Board voted in favor of two amendments to the game regulation found in 5 AAC 92.029(d)(2). Under prior versions of 5 AAC 92.029(d)(2) dating back to 1995, a bison not confined or under its owner's positive control was deemed feral and subject to the jurisdiction of the Board "unless the

animal is a free-ranging animal *under* a state or federal grazing lease."[7]  With the 2007 amendments, a bison was deemed feral "unless the animal is a free-ranging animal *on* a state or federal grazing lease."[8]  This word change from "under" to "on" made a free-ranging bison's physical presence on a federal or state grazing lease determinative of its classification and ownership status (domestic and privately owned if on lease, but if off lease presumed "feral," and thus game and property of the State).[9]  This "feral" presumption could be overcome if a demonstrated owner pursued and captured the animal within 48 hours after the animal escaped confinement.[10]  An owner could also pursue and capture the animal more than 48 hours after it escaped confinement if the owner obtained a permit from the Department.[11]

The Board also amended 5 AAC 92.029(d)(2)(D) to reflect the reality that the Kodiak bison ranchers did not mark or brand their animals.  Prior to these amendments, ownership of an animal could be demonstrated only "by means of a clearly

---

[7]    5 AAC 92.029(d)(2) (1995), *as amended by* 5 AAC 92.029(d)(2) Reg. 138 (1996), *as amended by* 5 AAC 92.029(d)(2) Reg. 146 (1998) (emphasis added).

[8]    5 AAC 92.029(d)(2) (2007) (emphasis added).

[9]    5 AAC 92.029(d)(2)(C).  All wildlife in Alaska, including game, is the property of the State and held in trust for the people.  *See* Alaska Const. art. VIII, § 3 ("Whenever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use."); *Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 495 (Alaska 1988) ("Thus, common law principles incorporated in the common use clause impose upon the state a trust duty to manage the fish, wildlife and water resources of the state for the benefit of all the people.").

[10]    5 AAC 92.029(d)(2)(A).  We observe that Dorman's bison were not actually confined on his grazing lease because he was not required to fence his leased land, and because of the impracticability of fencing the boundaries of the lease in any event.

[11]    5 AAC 92.209(d)(2)(B).

visible permanent brand, ear tag, or owner's mark on the body of the animal."[12]  The amendment added the following to the above sentence: "except that in [Kodiak Island] for bison, ownership may be demonstrated by a sworn statement, under penalty of perjury, if all bison in the area in question are privately owned."[13]  Van Daele explained this amendment aimed to "give[] those land owners the same . . . responsibilities that they would have if the animals were marked.  It gives them 48 hours to bring the animals back, and longer if they work with the Department to get a permit to bring them back."

Finally, the Board amended 5 AAC 85.010(a)(1), which authorized the Department to announce a public hunt of bison in Kodiak by emergency order.  The Department assured the two ranchers that a two-year grace period would be in effect, until July 1, 2009, to allow the ranchers to retrieve their bison.  One Board member described the amendments as a "wake-up call" to Dorman, while Van Daele deemed the hunt a "surgical strike" that dealt with the problem in the most efficient way possible.

The Department's Division of Wildlife Conservation sent letters in May 2007 to Dorman and the second rancher informing them of the regulatory changes and explaining how to retrieve any off-lease bison.  The letters stated that during the two-year grace period, the ranchers or their agents could capture or shoot bison off lease by obtaining a permit from the Department.  In June 2007 Dorman, through his attorney, requested clarification of the retrieval permit application process.  One memorandum from the Department to Dorman explained, "[T]he Board's longstanding policy has been to take preventative measures when introduced species like bison are released into the wild, *or, as in your . . . case, simply allowed to roam at large*."  (Emphasis added.)

_____

[12]  *See* 5 AAC 92.029(d)(2)(D) Reg. 146 (1998), *as amended by* 5 AAC 92.029(d)(2)(D) (2007).

[13]  5 AAC 92.029(d)(2)(D).

On July 22, 2009, Dorman simultaneously filed two notices of appeal — one with the Board and one with the Department — challenging the Board's authority to open a sport hunt for "feral" bison that he lawfully owned. Both agencies responded in August 2009 explaining that Dorman was attempting to appeal Board regulations that could not be appealed through an administrative appeal process. On January 11, 2010, Dorman received a written statement from the Department informing him that a registration hunt for feral bison was "rapidly approaching" and would be authorized for the upcoming winter "if the bison remain in the Hidden Basin area and there is no attempt to obtain a permit and return them to the lease."

## B.     Proceedings

Dorman filed suit in superior court in January 2010 challenging the amendments to 5 AAC 92.029(d)(2) and 5 AAC 85.010(a)(1) on a variety of constitutional and statutory grounds. Dorman sought declaratory and injunctive relief as well as damages. The State filed a motion for summary judgment seeking dismissal of Dorman's claims; Dorman filed a motion for summary judgment seeking only declaratory relief.

In July 2011, the superior court ruled on the cross-motions for summary judgment in favor of the State on all but Dorman's fifth cause of action, which alleged the Department had not complied with the procedural requirements of the Administrative Procedure Act, AS 44.62.010. As relevant here, the order granting the State's motion for summary judgment determined as a matter of law that the amendments to 5 AAC 92.029(d)(2) did not contravene Alaska's statutes, existing case law, or dictionary definitions of "feral" or "domestic." Dorman was granted leave to file an amended complaint, and the superior court ultimately granted the State's second motion for summary judgment on Dorman's remaining fifth cause of action, and its third motion for summary judgment on Dorman's claims in his amended complaint, while denying

Dorman's second cross-motion for summary judgment on his remaining fifth cause of action. Final judgment was entered in August 2012. The superior court granted the State's motion for Alaska Civil Rule 82(b)(2) attorney's fees in the amount of $8,757.17.

Dorman timely filed this appeal.[14]

## III. STANDARD OF REVIEW

We review a grant of summary judgment de novo, drawing all reasonable inferences in favor of the nonmoving party.[15] "Summary judgment is proper if there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law."[16]

---

[14] In the present appeal Dorman argues that the superior court erred when it held that: (1) Dorman did not comply with the regulation as drafted; (2) the Board had legal authority to implement the amendments to 5 AAC 92.029(d)(2) and 5 AAC 85.010(a)(1); (3) the Board lawfully imposed a confinement requirement (as Kodiak is not within a designated controlled livestock district as specified in AS 03.35.010-.070); (4) the Board did not violate Dorman's rights to administrative appeal and adjudication; (5) the amendments did not violate Dorman's rights to equal protection under article I, section 1 of the Alaska Constitution, or the Fourteenth Amendment of the United States Constitution; (6) the amendments did not violate Dorman's rights to due process and fair and just treatment under article I, section 7 of the Alaska Constitution, or due process under the Fourteenth Amendment to the United States Constitution; (7) the amendments did not constitute a taking under article I, section 18 of the Alaska Constitution, or the Fifth Amendment to the United States Constitution.

Our decision today addresses only the second issue Dorman raises, whether the Board's exercise of authority in amending the regulations was reasonable and not arbitrary.

[15] *West v. State, Bd. of Game*, 248 P.3d 689, 694 (Alaska 2010).

[16] *Id.* (citing *Parson v. State, Dep't of Revenue, Alaska Hous. Fin. Corp.*, 189 P.3d 1032, 1036 (Alaska 2008)).

Regulations are presumed valid, and the burden of proving otherwise is on the challenging party.[17] We review an agency's regulation to determine

> whether it is "consistent with and reasonably necessary to implement the statutes authorizing [its] adoption." Toward this end we consider: (1) whether [the agency] exceeded its statutory authority in promulgating the regulation; (2) whether the regulation is reasonable and not arbitrary; and (3) whether the regulation conflicts with other statutes or constitutional provisions.[18]

Reviewing whether a regulation is reasonable and not arbitrary "consists primarily of ensuring that the agency has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making."[19]

The interpretation of a statute is a question of law to which we apply our independent judgment.[20] We interpret Alaska law "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[21]

---

[17]    *Id.* (citing *Lakosh v. Alaska Dep't of Envtl. Conservation*, 49 P.3d 1111, 1114 (Alaska 2002)).

[18]    *Wilber v. State, Commercial Fisheries Entry Comm'n*, 187 P.3d 460, 464-65 (Alaska 2008) (quoting *Grunert v. State*, 109 P.3d 924, 929 (Alaska 2005)) (first alteration in original).

[19]    *Interior Alaska Airboat Ass'n, Inc. v. State, Bd. of Game*, 18 P.3d 686, 690 (Alaska 2001) (citing *Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314, 1319 (Alaska 1994); *Gilbert v. State, Dep't of Fish & Game, Bd. of Fisheries*, 803 P.2d 391, 398 (Alaska 1990)).

[20]    *West*, 248 P.3d at 694 (citing *Parson*, 189 P.3d at 1036).

[21]    *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999) (citing *Alaska Wildlife Alliance v. Rue*, 948 P.2d 976, 979 (Alaska 1997)).

## IV.    DISCUSSION

The Board of Game has authority pursuant to AS 16.05.255 to:

adopt regulations it considers advisable in accordance with AS 44.62 (Administrative Procedure Act) for[:]

. . . .

(2) establishing open and closed seasons and areas for the taking of game;

(3) establishing the means and methods employed in the pursuit, capture, [and] taking . . . of game, including regulations, consistent with resource conservation and development goals . . .[; and]

. . . .

(7) watershed and habitat improvement, and management, conservation, protection, use, disposal, propagation, and stocking of game.

In recognition of the Board's authority to enhance resource conservation and development and to promote watershed and habitat improvement, AS 16.05.940(19) provides that the Board may also regulate previously domestic animals introduced into the wild that have become feral; the statute defines game as "any species of bird, reptile, and mammal, including a feral domestic animal, found or introduced in the state, except domestic birds and mammals."   The question before us, then, is whether the Board's regulatory definition of "feral" in its amendment to 5 AAC 92.029(d)(2) is consistent with and reasonably necessary to implement the statutes authorizing its adoption.  We conclude that it is not.

A.    **The Board's Regulatory Definition Of "Feral" Is Arbitrary.**

In deciding whether a regulation is reasonable and not arbitrary we

scrutinize process, not policy.[22]  An agency's decision will be regarded as arbitrary where it fails to consider an important factor.[23]  We do not "examine the content of the regulation [or] judge its wisdom,"[24] but we do stress that the regulation must be reasonably related to its goal.[25]  The agency must take a close look at the problems it seeks to address[26] and consider important policy factors, even if "every possible factor may not have been debated."[27]

We observe at the outset that the term "feral" found in AS 16.05.940(19) can be traced to the common law concept *ferae naturae*,[28] meaning "of a wild nature,

---

[22]     *Interior Alaska Airboat Ass'n, Inc.*, 18 P.3d at 693.

[23]     *Id.*; *see also Southeast Alaska Conservation Council, Inc. v. State*, 665 P.2d 544, 548-49 (Alaska 1983), *superceded on other grounds by statute as recognized in State v. Native Vill. of Nunapitchuk*, 156 P.3d 389, 392 (Alaska 2007).

[24]     *Kingery v. Chapple*, 504 P.2d 831, 835 (Alaska 1972).

[25]     *Meier v. State, Bd. of Fisheries*, 739 P.2d 172, 174 (Alaska 1987) (examining regulation in order to determine whether it is reasonably related to its goal of allocating the salmon harvest between driftnet and setnet fishermen).

[26]     *Gilbert v. State, Dep't of Fish & Game, Bd. of Fisheries*, 803 P.2d 391, 398 (Alaska 1990) (reviewing the record to determine whether the agency took a close look at the problems affecting Chignik salmon and thus engaged in reasoned decision making).

[27]     *Id.*; *see also Interior Alaska Airboat Ass'n, Inc.*, 18 P.3d at 693-94 (holding that, where the challenger merely disputes the relative weight the agency accorded to important policy factors, we are not empowered to resolve that dispute).

[28]     *McDowell v. State*, 785 P.2d 1, 11 (Alaska 1989) ("This right which one individual has in common with every other individual in the community to take and use fish and game, *ferae naturae*, is one that has existed from the remotest times." (quoting *Lewis v. State*, 161 S.W. 154, 155 (Ark. 1913)) (internal quotation marks omitted)); *Warren Cnty. Combined Health Dist. v. Rittenhouse*, 689 N.E.2d 1036, 1038 (Ohio App. (continued...)

untamed."[29] *Ferae naturae* is a term "used to designate animals not . . . regarded as reclaimed so as to become the subject of property"[30] or human ownership.[31] "Feral" and "*ferae naturae*" appear in legal[32] and non-legal[33] dictionaries.

---

[28](...continued)
1997) ("The law divides animals into two classes, domesticated animals, or *domitae naturae*, and wild animals, or *ferae naturae*."); BLACK'S LAW DICTIONARY 102 (9th ed. 2009) (defining an animal *ferae naturae* as "[a]ny animal not statutorily designated as a domestic animal" and a feral animal as "[a] domestic animal that has returned to a wild state").

[29]      2 BOUVIER'S LAW DICTIONARY 1207 (8th ed. rev. 3d 1914).

[30]      *Id*.

[31]      *Earl v. Van Alstine*, 8 Barb. 630, 631 (N.Y. Gen. Term. 1850) ("[The] classification of animals by the common law into animals *ferae naturae* and *domitae naturae* has reference mainly if not exclusively, to the rights of property which may be acquired in them; those of the latter class being the subjects of absolute and permanent ownership, while in regard to the former only a qualified property can exist, and the distinction is based upon the extent to which they can be domesticated or brought under the control and dominion of man.").

[32]      *See* BLACK'S LAW DICTIONARY 102, 696 (9th ed. 2009) (defining feral and *ferae naturae*); BALLENTINE'S LAW DICTIONARY 465 (3d ed. 1969) (defining *ferae naturae*); 2 BOUVIER'S LAW DICTIONARY 1207 (8th ed. rev. 3d 1914) (defining *ferae naturae*).

[33]      *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 650 (5th ed. 2011) (defining feral); THE NEW SHORTER OXFORD ENGLISH DICTIONARY 934 (1993) (defining feral and *ferae naturae*); WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 472 (1988) (defining feral); WEBSTER'S NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE 515 (2d ed. 1976) (defining feral and *ferae naturae*); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 838 (1966) (defining feral and *ferae naturae*); *cf.* WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 81 (1st ed. 1828) (defining "ferine" as "wild; untamed; savage").

The Board's stated goal at its March 2007 meeting, as summarized by Department biologist Larry Van Daele, was to "change the definition of feral" by regulation, even though Van Daele admitted "we know who [these bison] belong to." We find this premise troubling, as *any* discussion of dictionary, or even scientific,[34] definitions of the statutory term "feral" at the Board meeting would have revealed the incongruity of defining "feral" to apply to unmarked bison in Kodiak where "it [was] common knowledge who they belong[ed] to." That is, if the bison "belong[ed] to" Dorman they could not, by definition, be feral under the majority of linguistic or scientific explanations that we have uncovered.

The Board also failed to consider the Department's prior efforts to define the statutory term "feral." The Department had previously sought the Attorney General's legal advice on how to define the statutory term "feral."[35] Most revealing is a 1987

---

[34]  *See* THE ENCYCLOPEDIA OF APPLIED ANIMAL BEHAVIOR & WELFARE 263 (Daniel S. Mills et al. eds., 2010) (discussing a "feral" animal as one who "revert[s] to a wild or semi-wild state, with little or no dependence on humans"); Edward O. Price, *Behavioral development in animals undergoing domestication*, 65 APPLIED ANIMAL BEHAVIOUR SCIENCE 245, 262 (1999) ("[T]he process of feralization has meant different things to different people. Some [scholars] . . . suggest that in addition to their free-ranging status, feral animals *must be unowned*, not intentionally cared for by humans, and not dependent on humans for breeding . . . . Those with a more evolutionary viewpoint describe feral animals as undergoing the domestication process in reverse . . . . If one accepts the thesis that domestication involves genetic change . . . the process of feralization, like domestication, *is seldom achieved in a single generation*." (emphasis added) (citations omitted)).

[35]  *See* STATE OF ALASKA, DEP'T OF LAW, INFORMAL OP. ATT'Y GEN., 1987 WL 121153 (July 30, 1987) (interpreting the term "feral" found in AS 16.05.940); *see also* STATE OF ALASKA, DEP'T OF LAW, INFORMAL OP. ATT'Y GEN., 1987 WL 121161 (Aug. 24, 1987) (determining the legal status of a herd of allegedly feral bison on Popof Island and delineating procedures for vesting title thereof).

Informal Opinion of the Attorney General on the status of a bison herd on Popof Island.[36] That Opinion concluded that "a bison . . . 'lawfully owned' [by any private person or group] is not subject to your department's management jurisdiction; but if the animal becomes feral, it is subject to state jurisdiction."[37] The Opinion explained that the inquiry into whether a bison had become feral turned on the specific facts of the case. On Popof Island,

> (1) the bison [had] been roaming free about the island [for at least 25 years]; (2) they [were] not and [had] not been fenced, corralled, handled, or otherwise brought under man's dominion; (3) they [had] not been grazing under a grazing lease; (4) it [was] unlikely that any of the originally transplanted bison [were] still alive — the herd probably [was] composed only of offspring of the original transplanted bison that [had] been born and [had] lived in a wild state; [and] (5) there [was] no evidence of a valid chain of title to the bison as privately owned stock.[38]

It is not so much that none of these possible policy considerations applies to Dorman's bison — it is that none appears to have even been considered at the Board meeting. Were these factors considered, the first factor would reveal that, at most, Dorman's bison had wandered off lease for five years, not twenty-five.[39] And according to Dorman, he had corralled his bison back on lease and continued to exercise authority over them.[40]

---

[36]    INFORMAL OP. ATT'Y GEN., 1987 WL 121161.

[37]    *Id.* at *2.

[38]    *Id.*

[39]    Dorman vehemently denied that his bison remained off lease for more than two weeks at a time.

[40]    Van Daele admitted that Dorman did corral his herd, just not rapidly
(continued...)

Further, the animals had been grazing under a lease, even if they also strayed off lease to graze.[41]  Dorman also provided a written affidavit to the superior court attesting to his purchase of the original 30 bison from a commercial domestic livestock owner in Homer and his subsequent breeding of that stock; none had been born in the wild or lived in a wild state.  Finally, Dorman consistently defended and provided evidence of his title to his privately owned bison, and no one disputed his ownership.

We highlight these factors to underscore that, instead of considering objectively ascertainable, fact-driven standards for defining when a domestic bison becomes feral, when the Board drafted the amendments to 5 AAC 92.029(d)(2) and 5 AAC 85.010(a)(1), it defined "feral" solely with reference to a grazing lease's boundary line:  the instant a lawfully owned, domestic bison crosses over the boundary line of the grazing lease, it is automatically classified as feral, owned by the State, and subject to an emergency hunt.  At oral argument, counsel for the State conceded that the regulation operates to transform from privately owned domestic to instantaneously "feral" any one of the free-ranging species listed in the statute the moment the animal steps foot off its owner's grazing lease.  If the animal steps back onto the lease, the animal becomes a lawfully owned domestic mammal once again.

In order for a regulation to pass muster under a reasonable-and-not-arbitrary standard of review, the agency must take a close look at the problems it seeks to

---

[40](...continued)
enough, and the animals returned to the Wild Creek/Hidden Basin area of state land as chronic strays in winter.

[41]   A memo from the Department to Dorman admitted as much:  "[T]he Board's longstanding policy has been to take preventative measures when introduced species like bison are released into the wild, *or, as in your . . . case, simply allowed to roam at large.*" (Emphasis added.)

address[42] and consider important policy factors, even if "every possible factor may not have been debated."[43] Here, the Board created a definition of "feral" solely with reference to a property boundary line and solely to target an individual whose livestock continuously strayed off lease. We cannot say as a matter of law that this process was a reasonable one.

## B.    The Regulation Conflicts With Other Statutes.

Alaska Statute 16.05.940(19) defines game as "any species of . . . mammal, *including a feral domestic animal*, . . . except domestic . . . mammals" and provides that "game may be classified by regulation." (Emphasis added.) The statute indicates that the legislature anticipated that domestic animals would undergo a process of feralization, and bestowed upon the Department discretionary authority to enact regulations concerning these animals, provided that the Board properly classified them as game. All the statute dictates to the Board is that "game" cannot, by regulation, include "domestic mammals."

But AS 16.05.940(10) defines "domestic mammals" to "include musk oxen, *bison*, and reindeer, *if they are lawfully owned*." (Emphasis added.) Thus, when enacting a regulation reasonably related to its goals of defining feral domestic animals, so as to protect and promote resource conservation, development, and watershed and habitat improvement,[44] the Board may not classify lawfully owned domestic mammals as game. This is precisely what the Board did in this case. The Board's failure to

---

[42]     *See Gilbert v. State, Dep't of Fish & Game, Bd. of Fisheries*, 803 P.2d 391, 398 (Alaska 1990).

[43]     *Id*.; *see also Interior Alaska Airboat Ass'n, Inc. v. State, Bd. of Game*, 18 P.3d 686, 693-94 (Alaska 2001).

[44]     *See* AS 16.05.255.

consider this statutory provision falls short of what is required under our standard, which examines whether the regulation conflicts with other statutes.[45]

This is not to say that a situation can never arise where a lawfully owned domestic mammal reverts to a feral state, nor do we intend to minimize the Board's concern with "quite a bit of destruction or alteration of habitat" in the Hidden Basin wetlands of Kodiak where Dorman's bison wintered. But the Board simply cannot, by regulation, transmute the legal status of a lawfully owned domestic animal from private property to game by the arbitrary and expedient determination that the animal becomes feral (and thus game) solely by crossing a boundary line. Nor can the Board draft a regulation that defines "game" to include "domestic mammals," such as lawfully owned bison that wander off their state grazing lease.

### C. We Vacate The Award Of Attorney's Fees To The State.

Because we reverse the superior court's grant of summary judgment to the State, we also vacate the court's determination of the State's prevailing party status and its award of Rule 82(b)(2) attorney's fees, and remand for reconsideration of the attorney's fees issue.

## V. CONCLUSION

We hold that 5 AAC 92.029(d)(2) is invalid as a matter of law. We likewise hold invalid the portions of 5 AAC 85.010(a)(1) that authorize a hunt by emergency order, the hunting season, and the bag limit for bison in Unit 8, which includes Kodiak. We REVERSE the superior court's grant of summary judgment in favor of the State, VACATE its order awarding attorney's fees to the State, and REMAND the attorney's fees issue to the superior court.

---

[45] *See Wilber v. State, Commercial Fisheries Entry Comm'n*, 187 P.3d 460, 464-65 (Alaska 2008) (citing *Grunert v. State*, 109 P.3d 924, 929 (Alaska 2005)).