NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>                    Appellant,<br><br>          v.<br><br>ALISHA L. ROSENBRUCH-DECKER,<br><br>                    Appellee. | Court of Appeals No. A-13867<br>Trial Court No. 1JU-20-00296 CR<br><br><br>O P I N I O N |
| STATE OF ALASKA,<br><br>                    Appellant,<br><br>          v.<br><br>ZACHARIAH BRENT DECKER,<br><br>                    Appellee. | Court of Appeals No. A-13868<br>Trial Court No. 1JU-20-00295 CR<br><br><br>No. 2801 — March 28, 2025 |

Appeal from the District Court, First Judicial District, Juneau, Kirsten Swanson, Judge.

Appearances: Ronald Dupuis, Assistant Attorney General, Office of Special Prosecutions, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellant. Susan Orlansky, Reeves Amodio LLC, Anchorage, for the Appellees.

Before: Allard, Chief Judge, and Wollenberg and Terrell, Judges.

Judge TERRELL.

Big game guides Zachariah Brent Decker and Alisha L. Rosenbruch-Decker were leading a mountain goat hunt in southeast Alaska. After their client fired a gunshot wounding a goat, Decker conveyed the animal's location to Rosenbruch-Decker using a radio. Rosenbruch-Decker then helped the client locate the goat, and the client fired a second shot that killed the animal. Decker and Rosenbruch-Decker were charged with violating a fish and game regulation, 5 Alaska Administrative Code (AAC) 92.080(7)(I), that prohibits "taking" a game animal with the aid of a wireless communication device.[1] They were also charged with two additional offenses that derived from the violation of 5 AAC 92.080(7)(I).[2]

Decker and Rosenbruch-Decker filed a motion to dismiss their charges on three grounds: (1) that they had not used a radio to "take" the goat, as that term is defined in AS 16.05.940(35), because the goat had already been "taken" when it was initially shot and mortally wounded; (2) that the State's contrary interpretation of "take" was unconstitutionally vague and overbroad; and (3) that prosecuting them violated their substantive due process rights because they had been placed in an impossible situation if they were not allowed to use radios to locate the goat. The district court agreed and dismissed Decker and Rosenbruch-Decker's cases.

For the reasons explained in this opinion, we reverse the decision of the district court.

---

[1]    5 AAC 92.080(7)(I).

[2]    AS 08.54.720(a)(8)(A) and 5 AAC 92.140(a), respectively.

*Background facts and proceedings*

In November 2018, Zachariah Brent Decker and Alisha L. Rosenbruch-Decker guided a nonresident client on a hunt in the Endicott Arm in southeast Alaska.[3] The group traveled to the area on a large vessel, anchored the vessel, and then used a skiff to scan the surrounding hillsides. After spotting a goat from the water, the guides and their client went ashore and hiked up the hillside to get a better shot at the goat.

The client fired a shot from his rifle at the goat, which struck the goat. At the time, the guides were unsure where exactly the shot had hit the goat, even though they knew it had been hit. (It was later determined that this shot struck the goat in the head.) When it was initially hit by the bullet, the goat ran away, leaving it out of sight from the hunters' position.

When the goat moved into the brush, Decker got into the skiff and distanced himself from the land to ascertain the goat's location. Once he spotted it, Decker used a radio to convey the goat's location to Rosenbruch-Decker. Based on these directions, Rosenbruch-Decker and the client were then able to find the goat. The client shot the goat again, killing it. Other nearby hunters overheard the radio communications and reported the incident to wildlife troopers. The client and Rosenbruch-Decker skinned the goat and salvaged the meat before returning to the boat.

The State charged Decker and Rosenbruch-Decker with violating a regulation, 5 AAC 92.080(7)(I), that prohibits "taking" a game animal with the aid of a wireless communication device.[4] Based on the violation of this regulation, they were also charged with the derivative offenses of (1) being a licensed game guide and "commit[ing] or aid[ing] in the commission of a violation of . . . a state or federal

---

[3]  For purposes of this appeal, the key facts are not disputed.

[4]  5 AAC 92.080(7)(I). This offense is a class A misdemeanor. AS 16.05.925(a).

wildlife or game statute or regulation,"[5] and (2) possessing or transporting "game or parts of game that the person knows or should know were taken in violation of . . . AS 16 or a regulation adopted under AS 16."[6]

Decker and Rosenbruch-Decker moved to dismiss these charges. First, they argued that they did not "take" the goat with the aid of a radio. Rather, they argued that "the mountain goat was 'taken' when the client [first shot and] fatally wounded the mountain goat," and that they only used the radio to locate the goat after it was already "taken." Second, they argued that "the State's interpretation of 'take'" was unconstitutionally vague and overbroad. Third, they argued that their due process rights were violated because "after the client shot and terminally wounded the mountain goat, the[y] were faced with competing legal obligations that all carried criminal sanctions."

The State opposed the motion to dismiss. The State disputed that the "taking" was complete when the initial shot struck the goat. Rather, the State noted that the statutory definition of "take" includes an array of human conduct directed at animals, including "pursuing," "hunting," *and* "killing" an animal. The State also argued that because Decker and Rosenbruch-Decker could have located the goat without using radios, they were not placed in an unfair dilemma warranting dismissal of their charges.

The district court found that the first shot mortally wounded the goat, and that the "taking" of the goat was therefore complete when the first bullet struck it. The court also agreed that the State's prosecution violated Decker and Rosenbruch-Decker's due process rights, and found that the State's interpretation of "take" failed to give hunters adequate notice and afforded undue discretion to prosecuting authorities. Accordingly, the court dismissed the charges, leading to the present State's appeal.

---

[5]   AS 08.54.720(a)(8)(A). This offense is an unclassified misdemeanor punishable by a maximum of one year in prison or a fine of $30,000. AS 08.54.720(c).

[6]   5 AAC 92.140(a). This offense is a class A misdemeanor. AS 16.05.925(a).

*Why we conclude that the definition of "taking" includes ongoing conduct until the point when an animal is captured or killed*

Under AS 16.05.940(35), "take" is defined as "taking, pursuing, hunting, fishing, trapping, or in any manner disturbing, capturing, or killing, or attempting to take, pursue, hunt, fish, trap, or in any manner capture or kill fish or game."[7] The term "take" is central to Alaska's fish and game laws. For example, under AS 16.05.920, the provision that regulates the conduct of hunters and fishers and forms the basis for wildlife management, "a person may not *take*, possess, transport, sell, offer to sell, purchase, or offer to purchase . . . game" unless permitted by statute or regulation.[8]

Decker and Rosenbruch-Decker were charged with violating a fish and game regulation that specifies which means and methods hunters may use (and may not use) when "taking" game. The parties to this appeal argue for different interpretations of what it means to "take" an animal, reprising the arguments made in the district court.

"When 'interpreting a statute, we consider its language, its purpose, and its legislative history, in an attempt to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others.'"[9] We begin with the text and its plain meaning and use a "sliding-scale approach" to interpret the language.[10]

---

[7] AS 16.05.940(35). This provision remains unchanged from its enactment in 1959, shortly after statehood. SLA 1959, ch. 94, § 2(h).

[8] AS 16.05.920(a) (emphasis added); *Charles v. State*, 232 P.3d 739, 741 n.5 (Alaska App. 2010) (recognizing that "a person may not take any game unless permitted by statute or regulation"). Many regulations also use the variant, "taking." This can be seen in the section headings to key hunting regulations: 5 AAC 92.075 ("Lawful methods of taking game"); 5 AAC 92.080 ("Unlawful methods of taking game; exceptions"); 5 AAC 92.090 ("Unlawful methods of taking fur animals"); 5 AAC 92.095 ("Unlawful methods of taking furbearers; exceptions").

[9] *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019) (quoting *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1234 (Alaska 2003) (internal quotation omitted)).

[10] *Id.* (quoting *Ward v. Dep't of Pub. Safety*, 288 P.3d 94, 98 (Alaska 2012)).

Under that approach, "the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be."[11]

Our task in interpreting the statutory definition of "take" in AS 16.05.940(35) is complicated by the absence of legislative history surrounding the adoption of the statute. The statutory definition was enacted in 1959, in the first legislative session after Alaska attained statehood.[12] Unfortunately, "[n]o [Alaska legislative] committee minutes or bill files survive from before 1965, so the only source of legislative history is the journals."[13] Our research confirms the parties' assertions that the legislative journals provide no insight as to the meaning of the statute.

Accordingly, we construe the provision by considering the plain language of the statute, by applying basic canons of statutory construction, and by looking at how the term has been interpreted by the Alaska Board of Game.

But before interpreting the statutory definition of "take" in AS 16.05.940(35), we will provide a brief overview of the meaning of "take" under the common law. At common law, the term "take" focused on when the animal in question was reduced to the hunter's possession or control, for purposes of determining who had a property interest in the animal.[14] The common law meaning of "take" provides a useful contrast to Alaska's more expansive statutory definition of "take." As we will explain, the statutory definition of "take" is broader than the common law, covering a wider window of human conduct, from when a person begins or attempts to hunt, fish, or pursue an animal, through when the animal is actually captured or killed.

---

[11] *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016) (quoting *Adamson v. Municipality of Anchorage*, 333 P.3d 5, 11 (Alaska 2014)).

[12] SLA 1959, ch. 94, § 2(h).

[13] Susan Falk, *Introduction to Researching Alaska Legislative History Materials*, 28 Alaska L. Rev. 279, 283 (2011).

[14] *State v. Schmid*, 859 N.W.2d 816, 821 (Minn. 2015) (cited cases omitted).

## 1. The common law meaning of "take"

Long before the term was defined in Alaska statute, "take" had an established meaning at common law in the context of hunting wild animals — specifically, "to reduce those animals, by killing or capturing, to human control."[15] However, this definition of "take" had a fairly narrow meaning since it was a function of property law doctrine. At common law, a "take" held legal significance because it was used to identify which hunter had a vested property right in a wild animal.[16] Given this property-focused application, the hallmark of a "take" is the result of a successful hunt: the capture or killing of an animal.

In early, pre-Magna Carta England, wild animals were viewed as the property of the sovereign, but over time, the regulation of the taking of game became subject to the popular sovereignty.[17] As the common law carried over to America, wild animals were considered the property of sovereign state governments, held in trust for the people.[18] "Taking" an animal involved the process by which a person gained

---

[15] *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 717-18 (1995) (Scalia, J., dissenting, joined by Rehnquist, C.J., and Thomas, J.) (citing historical sources discussing traditional usage of the term "take" as to wild animals). The Alaska Supreme Court made this point in *Ellingson v. Lloyd*, 342 P.3d 825 (Alaska 2014), where the court cited an 1850 New York case for the proposition that persons can acquire a property interest in a wild animal ("animals *ferae naturae*") by bringing the animal under the person's "control and dominion." *Id.* at 831 n.31 (citing *Earl v. Van Alstine*, 8 Barb. 630, 631 (N.Y. Gen. Term. 1850)).

[16] *See Pierson v. Post*, 3 Cai. R. 175, 177 (N.Y. 1805) (describing long-standing principles of law as providing that "pursuit alone vests no property or right in the huntsman; and that even pursuit, accompanied with wounding, is equally ineffectual for that purpose, unless the animal be actually taken"); *Geer v. Connecticut*, 161 U.S. 519, 523 (1896) ("[A]ll the animals which can be taken upon the earth, in the sea, or in the air, — that is to say, wild animals, — belong to those who take them, because that which belongs to nobody is acquired by the natural law by the person who first possesses it.").

[17] *See McDowell v. State*, 785 P.2d 1, 11-12 (Alaska 1989).

[18] *See id.* The idea that sovereign governments "own" wild animals is a legal fiction, and it is more accurate to say that these governments have the right to regulate the use and

ownership or a property right in the animal, and involved compliance with applicable laws governing acquisition of the animal (*i.e.*, hunting, fishing, or trapping laws).[19]

Under the common law meaning of the term, an animal is not "taken" until the animal is captured or killed; pursuing an animal, or even wounding an animal, is insufficient to constitute a taking. In *Pierson v. Post*, a seminal decision in property law, Post had been pursuing a fox on a hunting expedition with his hounds.[20] But before he could capture the animal, Pierson came upon the fox, killed it, and carried away the carcass.[21] Post sued Pierson for the fox.[22] The New York Supreme Court rejected Post's claim, holding that neither pursuit alone, nor even pursuit accompanied by wounding an animal, amounts to a taking (*i.e.*, vests the hunter with a property right in the animal).[23] Rather, a "taking" does not occur until the animal has been reduced to the hunter's possession or control.[24]

---

taking of such animals and to establish the legal conditions for individuals to take fish and game. *See Pullen v. Ulmer*, 923 P.2d 54, 59 (Alaska 1996).

[19] *See, e.g.*, *Bailey v. Smith*, 581 S.W.3d 374, 391-92 (Tex. App. 2019) ("Under the public trust doctrine an animal must be 'legally removed' from the wild before property rights can arise in it.").

[20] *Pierson*, 3 Cai. R. at 175-76.

[21] *Id.*

[22] *Id.*

[23] *Id.* at 177-79 (citing, *inter alia*, Justinian's Institutes, a sixth-century codification of Roman law; Fleta, a treatise on English common law from the late thirteenth century; and Bracton, an English legal commentator from the 1200s).

[24] Courts outside of the hunting context have applied this same common law interpretation of what it means to "take" an animal. In the context of cattle theft charges, the Texas Court of Criminal Appeals in *Rosenbush v. State*, 122 S.W.2d 1071, 1072 (Tex. Crim. App. 1938), relied on an earlier decision, *Minter v. State*, 9 S.W. 561 (Tex. App. 1888), where the court stated that "[w]e have found no authority which holds that mere wounding of an animal upon its range, and the pursuit of it without capturing it, without bringing it in some way under the control and dominion of the party, is sufficient to

Due to its emphasis on when property rights vest, the common law meaning of a "taking" references a singular point in time — the moment that the hunter takes possession or control of the animal. As we are about to explain, Alaska's statutory definition of "take" is written more broadly than its common law meaning. Rather than referencing a specific moment in time, Alaska's definition of "take" includes human conduct leading up to, and including, the act of killing or capturing an animal.

*2. The plain language of the statutory definition of "take" supports the view that taking an animal can include ongoing conduct and is not necessarily a one-time event*

In 1925, the United States Congress established the Alaska Game Commission and promulgated a game code for the Territory of Alaska.[25] This code created "open" and "closed" seasons for when "birds or animals may be lawfully taken," and defined "take" to mean:

> Taking, pursuing, disturbing, hunting, capturing, trapping, or killing game animals, land fur-bearing animals, game or nongame birds, attempting to take, pursue, disturb, hunt, capture, trap, or kill such animals or birds, or setting or using a net, trap, or other device for taking them, or collecting the nests or eggs of such birds, unless the context otherwise requires.[26]

---

constitute a taking." Likewise, in the robbery context, it has been stated that "[t]aking . . . is a common law term of art derived from the law of robbery and larceny. It refers to the act of 'securing dominion' over something." *United States v. Figueroa-Cartagena*, 612 F.3d 69, 78 (1st Cir. 2010) (cited and quoted sources omitted).

[25] Alaska Game Law, 43 Stat. 739, ch. 75 (1925).

[26] *Id.* at § 2.

This definition of "take" was included in the 1949 compiled laws of the Territory of Alaska.[27] There does not appear to be any caselaw from territorial Alaska interpreting this definition.

In 1959, shortly after Alaska attained statehood, the legislature created a fish and game code.[28] Under this code, "take" was defined in AS 16.05.940 as "taking, pursuing, hunting, fishing, trapping, or in any manner disturbing, capturing, or killing, or attempting to take, pursue, hunt, fish, trap, or in any manner capture or kill fish or game."[29] This provision remains unchanged since then.

We begin our analysis with the plain meaning of the statute. We note that the grammar and word choice used by the legislature suggests that its definition of "take" involves an ongoing process.[30] The verbs used in the statutory definition — "tak*ing*, pursu*ing*, hunt*ing*, fish*ing*, trapp*ing*, disturb*ing*, captur*ing*, and kill*ing*"[31] — are gerunds.[32] Courts have recognized that "the gerund or verbal noun form is used to denote a present or ongoing activity."[33] This supports the view that "taking" an animal

---

[27] ACLA § 39-6-1 (1949).

[28] SLA 1959, ch. 94.

[29] *Id.* at § 2(h).

[30] Courts "may assume that the legislature knew and understood the rules of grammar" and are "justified in relying on such rules in the interpretation of [Alaska] laws." *Studley v. Alaska Pub. Offs. Comm'n*, 389 P.3d 18, 25 n.36 (Alaska 2017) (alteration in original) (citing *Emp't Sec. Comm'n v. Wilson*, 461 P.2d 425, 428 (Alaska 1969)).

[31] AS 16.05.940(35) (emphasis added).

[32] *State v. Schmid*, 859 N.W.2d 816, 821 (Minn. 2015) (quoting Rodney Huddleston & Geoffrey K. Pullum, *The Cambridge Grammar of the English Language* 81 (2002) ("A gerund is traditionally understood as a word *derived from a verb base* which functions as or like a noun[.]") (emphasis in original)).

[33] *Midland Ins. Co. v. Home Indem. Co.*, 619 S.W.2d 387, 389 (Tenn. App. 1981); *accord State v. Brady*, 506 P.3d 1180, 1184 (Or. App. 2022).

includes the ongoing course of conduct that precipitates, and includes, the act of capturing or killing the animal.

In *State v. Kerr*, the Idaho Court of Appeals interpreted Idaho's definition of "take" and reached a similar conclusion.[34] Idaho Code § 36-202(i) defines "take" as "hunt, pursue, catch, capture, shoot, fish, seine, trap, kill or possess or any attempt to do so."[35] The Idaho definition, like Alaska law, lists a series of actions that meet the definition of "take," from "hunt" and "pursue" more broadly, to "kill" more specifically.

In *Kerr*, the defendant first shot and mortally wounded an elk, and then trespassed on private land to retrieve the injured animal.[36] During the pendency of the defendant's trespass case, a question arose as to whether state wildlife officials could seize the elk pursuant to a statute that allowed seizure of game that was "taken unlawfully."[37] The trial court ruled that Kerr committed an unlawful taking because he was in "pursuit" of the elk when he trespassed onto the land to retrieve it.[38]

Kerr argued on appeal that the "taking" of the elk was complete when he first shot it, before it entered the private property, and thus that he did not illegally "take" game by trespassing to retrieve the elk.[39] The Idaho Court of Appeals disagreed with Kerr's argument that the "taking" was complete when he shot the elk, stating that:

> The plain meaning of I.C. § 36-202(i) does not support Kerr's contention that only one taking can occur, as "take" is defined to encompass actions such as pursuing and

---

[34]  *State v. Kerr*, 408 P.3d 94, 97 (Idaho App. 2017).

[35]  *Id.* at 96.

[36]  *Id.* at 95.

[37]  *Id.* at 95, 97 (citing Idaho Code § 36-1304(b) (providing for state confiscation of wildlife taken unlawfully)).

[38]  *Id.* at 95-96.

[39]  *Id.* at 96.

hunting an animal. The statute unambiguously provides multiple methods by which an animal may be taken, with some of these methods being prerequisite steps to fulfilling other methods; *i.e.*, hunting and then killing. Accordingly, the magistrate's finding that Kerr took the elk more than once, by shooting it and then trespassing to take physical possession of it, was correct.[40]

Alaska's statutory definition of "take" is similar to Idaho's statutory definition. We agree with the Idaho Court of Appeals that as a matter of plain meaning, multiple different actions can fit within the umbrella definition of "take," and that a "take" is not necessarily a specific moment in time. Rather, an array of human conduct leading up to, and including, the act of killing or capturing an animal falls within the plain meaning of "take."

### 3. The Board of Game's interpretation of the law supports the State's interpretation of the temporal reach of the term "take"

Thus far, our statutory interpretation has focused on examining the meaning of "take" in light of the plain language of the statute. Having reviewed the plain language, it appears that "taking" an animal includes an ongoing course of conduct (*e.g.*, "pursuing" and "hunting") that precipitates and includes the act of capturing or killing the animal. This interpretation is consistent with how the entity charged with oversight and implementation of Alaska's game laws, the Alaska Board of Game (the Board), has interpreted this provision.[41]

---

[40] *Id.* at 97.

[41] *See Grimm v. Wagoner*, 77 P.3d 423, 434 & n.40 (Alaska 2003) (quoting 2B Norman J. Singer, *Sutherland on Statutory Construction* § 49.03 (6th ed. 2000)) ("[P]ractical interpretation of a statute by the . . . officers charged with its administration and enforcement . . . constitutes an invaluable aid in determining the meaning of a doubtful statute.").

In 2004, the Board promulgated a regulation, 5 AAC 92.220(i), which mandated that "[a] person who has wounded game shall make *every reasonable effort* to retrieve and salvage that game."[42] In March 2016, the Board considered a proposal to repeal this provision. A wildlife trooper testifying in support of the repeal noted that the regulation had led to uncertainty as to whether regulations setting out means and methods restrictions continue to apply after an animal had been wounded.[43] The trooper explained that hunters could use otherwise-forbidden means and methods, such as same-day airborne hunting or hunting with the aid of wireless communications, after wounding an animal under the theory that such efforts were "reasonable" to retrieve and salvage the wounded animal.[44]

Bruce Dale, Director of the Department of Fish and Game's Wildlife Conservation Unit, agreed with the testifying trooper that the regulation's language was problematic.[45] He also worried that hunters could use the "I'm sure I hit it" excuse in combination with this expansive interpretation of 5 AAC 92.220(i) to circumvent otherwise applicable hunting laws, to the detriment of the State's ability to prevent over-

---

[42] Alaska Reg. 170, pt. 1, 355 (July 1, 2004) (emphasis added). A separate statutory provision, AS 16.30.010(a), applies when big game animals or certain species of wild fowl are killed (not merely wounded), and makes it a class A misdemeanor "to fail intentionally, knowingly, recklessly, or with criminal negligence to salvage for human consumption the edible meat of the animal or fowl." *See also* AS 16.30.030(1) (defining "big game animal" as "moose, caribou, mountain sheep, mountain goat, feral reindeer, deer, elk, bison, walrus, or musk ox").

[43] Meeting of Alaska Board of Game, March 23, 2016, at 3:41:34 (remarks of Trooper Paul Fussey), https://www.adfg.alaska.gov/index.cfm?adfg=gameboard.meetinginfo& date=03-18-2016&meeting=fairbanks, (last visited on March 24, 2025). To listen to audio, click on "Meeting Audio" at the bottom of the page.

[44] *Id.*

[45] *Id.* at 4:03:27.

hunting and to responsibly manage Alaska's wildlife resources.[46] The Board ultimately agreed, and voted 5-2 to repeal 5 AAC 92.220(i).[47] Undergirding the Board's decision is the basic premise that means and methods restrictions continue to apply even *after* an animal is wounded, up until an animal is captured or killed. This understanding supports the plain language of AS 16.05.940(35) — that "take" is defined as an ongoing process that culminates when an animal is captured or killed.

Further, the overwhelming majority of means and methods restrictions, including the regulation relating to wireless communications that Decker and Rosenbruch-Decker are charged with violating, use the terms "take" or "taking" as present-tense mandates that apply until a hunt is complete.[48] But these same regulations set out a handful of exceptions that allow otherwise prohibited means and methods to be employed earlier in the process, after an animal is wounded.[49] These regulations reflect a recognition by the Board that, absent an exception, means and methods restrictions generally continue to apply until an animal is captured or killed. Significantly, many of these exceptions are of long-standing origin, showing that the Board has long had this understanding of the law.[50]

---

[46] *Id.*

[47] *Id.* at 4:09:05.

[48] *See, e.g.*, 5 AAC 92.080 ("The following methods of taking game are prohibited:").

[49] *See* 5 AAC 92.080(7)(C)(ii) - (iii) (allowing use of artificial lights by a tracking dog handler trying to track and dispatch a wounded big game animal, or when trying to track and dispatch a wounded game animal without the use of motorized vehicles); 5 AAC 92.085(5)(A) (allowing a tracking dog to be used to track wounded big game); 5 AAC 92.095(a)(8) (allowing trappers to shoot animals caught in traps or snares); 5 AAC 92.100(a)(3) (allowing boats to be used to retrieve "a dead or injured bird").

[50] *See, e.g.*, 5 AAC 81.115(3) (adopted by Alaska Reg. 58, 5-120 (July 1976)) (allowing boats to be used to retrieve dead or injured birds); 5 AAC 84.060(3) (adopted by Alaska Reg. 94, 5-146 (July 1985)) (allowing trappers to shoot beavers caught in snares);

The legislature, or the Board of Game in the exercise of its expertise regarding game management, may conclude that it is appropriate to permit hunters to use certain weapons, technology, or hunting techniques to locate and kill an animal after it has been wounded, but before it is dead.[51] There may be good reasons for doing so, such as to speed up the process of recovering an animal or to prevent animals from being subject to prolonged suffering. The legislature or the Board of Game may opt to create specialized provisions that limit the meaning of "take" to some subset of the full meaning encompassed in the statutory definition.[52] But the default rule is that means and methods restrictions for taking wildlife continue to apply until the animal is either captured or killed, in accordance with the type of hunting that the hunter is engaged in.

For the reasons stated above, we conclude that the district court erred in holding that the taking of the goat was complete when the hunter first shot and wounded it and that the means and methods restrictions set out in 5 AAC 92.080-.085 ceased to apply at that point.

---

Alaska Game Regul. 303.02(b)(1) (adopted by Alaska Reg. 24, 5-422 (July 1967)) (allowing the use of dogs in certain bear hunts).

[51] *See* AS 16.05.255(a)(3) (authorizing the Board of Game to enact regulations for "establishing the means and methods employed in the pursuit, capture, taking, and transport of game").

[52] A 1979 Attorney General Opinion noted that:

> The term "take" can be given different emphasis depending on the context of the law. For example, the term "take" when used in a bag limit definition (cf. 5 AAC 81.310 – a hunter must "take" in accordance with bag limits) is likely to be construed by a court to mean actually killing, not merely hunting or pursuing. The need for this construction is obvious when one considers that otherwise persons would be guilty of "taking" an entire flock of birds merely by aiming his gun in their direction.

1979 Inf. Op. Att'y Gen. No. A-66-253-79 at 3 (Alaska, Mar. 5, 1979), 1979 WL 22768, at *2 (emphasis in original) (citing *United States v. Chew*, 540 F.2d 759 (4th Cir. 1976)).

*Why we conclude that the statutory definition of "take" provides fair notice to hunters*

Decker and Rosenbruch-Decker alternatively argue that, if this Court interprets "take" to include the time period between when an animal is mortally wounded and when it dies, AS 16.05.940(35) fails to provide adequate notice of the broad meaning of "take." However, as we noted in *De Nardo v. State*:

> [T]he fact that people can, in good faith, litigate the meaning of a statute does not necessarily (or even usually) mean that the statute is so indefinite as to be unconstitutional. The question is whether the statute's meaning is unresolvably confused or ambiguous *after* it has been subjected to legal analysis. If study of the statute's wording, examination of its legislative history, and reference to other relevant statutes and case law makes the statute's meaning clear, then the statute is constitutional.[53]

Further, the principle that "criminal statutes are generally construed strictly . . . 'does not require that statutes be given the narrowest meaning allowed by [their] language.'"[54] Rather, they "should still be given 'a reasonable or common sense construction, consonant with the objectives of the legislature.'"[55] In light of a careful examination of the statute's text and the common law meaning of "taking" an animal, we hold that the statute is not vague or ambiguous and provides sufficient notice to hunters.

---

[53] *De Nardo v. State*, 819 P.2d 903, 908 (Alaska App. 1991).

[54] *Grant v. State*, 379 P.3d 993, 995-96 (Alaska App. 2016) (quoting *State v. Jones*, 750 P.2d 828, 831 (Alaska App. 1988)).

[55] *Id.* at 996 (quoting *Belarde v. Municipality of Anchorage*, 634 P.2d 567, 568 (Alaska App. 1981)).

Decker and Rosenbruch-Decker also claim that the statutory definition of "take" is so vaguely written that it leaves room for arbitrary enforcement discretion.[56] The district court found that the law gave undue discretion to the State in prosecuting hunters under the law, but provided no analysis or support for this assertion.

Alaska's appellate courts have previously stated that hypothetical concerns are insufficient to invalidate a statute on this prong of a vagueness analysis; there must be "actual evidence of a history of arbitrary or capricious enforcement . . . or the language of the statute must be so conflicting and confused that arbitrary enforcement is inevitable."[57] The appellees do not point to any concrete examples of over-enforcement stemming from the statutory definition, and on appeal simply reassert that the definition of "take" "is so vague and standardless that arbitrary enforcement is inevitable." We disagree. The appellees' inability to identify concrete examples of arbitrary enforcement of the term "take" in a statute that is sixty-five years old is fatal to their arbitrary enforcement claim.

For these reasons, we reject the claim that the definition of "take" in AS 16.05.940(35) fails to provide adequate notice and is unconstitutionally vague. The conduct at issue here — firing a second shot to kill a wounded animal — fits squarely within the meaning of "taking" an animal.

---

[56] *Summers v. Municipality of Anchorage*, 589 P.2d 863, 868 (Alaska 1979) (noting the potential for arbitrary enforcement discretion as a basis for finding a statute unconstitutionally vague).

[57] *Leu v. State*, 251 P.3d 363, 369 (Alaska App. 2011) (citing cases).

*Why we conclude that the prohibition on using wireless communications to take the goat did not place the guides or their client in an unfair dilemma where they were subject to conflicting legal duties*

The district court also ruled that the State's interpretation of the regulatory scheme violated Decker and Rosenbruch-Decker's due process rights by placing them in an irreconcilable dilemma, similar to that in *Gudmundson v. State*.[58] We disagree.

In *Gudmundson*, the defendant hunters faced the difficult choice of how to proceed after they illegally killed a sheep in a closed area.[59] Upon realizing the dead sheep was in a closed area, the hunters were in a situation where they would inevitably commit an additional crime no matter what course of action they followed.[60] If they left the dead sheep in the field, they would commit the offense of wanton waste,[61] but if they packed the sheep out of the field, they would commit the offense of transporting an illegally harvested animal.[62] The hunters left the sheep in the field, and were convicted of wanton waste.[63] On appeal, the Alaska Supreme Court held that operation of this regulatory scheme, under which the defendants had no choice but to further violate the law, violated the defendants' substantive due process rights.[64]

Decker and Rosenbruch-Decker argued in the district court that their case is comparable to *Gudmundson*. More specifically, they contended that if they were not

---

[58]   *Gudmundson v. State*, 822 P.2d 1328 (Alaska 1991).

[59]   *Id.* at 1328-29.

[60]   *Id.* at 1329, 1333.

[61]   *Id.* at 1329 (citing AS 16.30.010(a)).

[62]   *Id.* (citing 5 AAC 92.140 (possession or transportation of illegally taken game)).

[63]   *Id.*

[64]   *Id.* at 1332-33; *Greinier v. State*, 23 P.3d 1192, 1196 (Alaska App. 2001) (citing *Gudmundson* and characterizing its holding as based on substantive due process).

allowed to use wireless communications to locate the wounded goat, they were bound to violate at least one of three duties: (1) to not take more animals than legally permitted,[65] (2) to recover a wounded animal, and (3) to salvage all edible meat. On appeal, Decker and Rosenbruch-Decker reframe their *Gudmundson* argument somewhat. They argue that, if accepted, the breadth of the State's definition of "take" in AS 16.05.940(35) would lead to the situation where "any choice might be found illegal."

Decker and Rosenbruch-Decker's arguments misapprehend *Gudmundson*. In *Gudmundson*, the defendants' first action — shooting a sheep in a closed area — was illegal. Following this unlawful shot, the defendants faced further criminal liability for both retrieving and not retrieving the sheep.

By contrast, the first action in Decker and Rosenbruch-Decker's case — helping a client shoot a goat in an open area — was legal. Because the guides and their client had not violated any game laws in firing that first shot, they were not subject to further criminal liability for recovering the animal (as the hunters in *Gudmundson* would have been).[66] And they had a legal option available to them for completing the hunt: locating and killing the goat *without* the use of radios. Thus, Decker and Rosenbruch-Decker were not placed in a catch-22 situation where conflicting legal duties would result in them committing a new criminal offense, no matter what they did (or failed to do).

Put simply, in *Gudmundson* it was *impossible* for the hunters not to violate any further laws. Here, while it might have been more difficult and labor-intensive for

---

[65] Their argument was that if they advised the client to shoot a second time, erroneously thinking that the animal the client was aiming for was the animal he had already wounded, and the client wounded or killed a second animal, they could be charged with allowing a client to shoot more game than legally permitted.

[66] *Gudmundson*, 822 P.2d at 1332 (noting the defendants could have been charged with violating 5 AAC 92.140 had they attempted to salvage the illegally harvested sheep).

Rosenbruch-Decker and the client to hike up to the goat's likely location and find it without using radios, it was nonetheless possible for them to do so and to complete the hunt without violating game regulations. The district court was mistaken to conclude that *Gudmundson* applied here and that it required dismissal of the charges.

*Conclusion*

For the foregoing reasons, the district court's order dismissing the charges against Decker and Rosenbruch-Decker is REVERSED, and this case is remanded for further proceedings.